### In the matter of TAYLOR, a lunatic.

Where a gentleman introduced a female who was previously living with him as a house keeper, to his friends as his wife, and from that time for the period of eleven years continued to cohabit with her as his wife, holding her out to the world as sustaining that relation to him, and had several children by her who were called by his name : *Held*, that these facts were sufficient to authorize a court or jury to presume an actual marriage between the parties, by a contract in presenti, at the commencement of such matrimonial cohabitation.

The acts and declarations of a man and woman and other attending circumstances, during their cohabitation together, being part of the *res gestæ*, are proper evidence to show the character of their intercourse ; whether it was matrimonial or meretricious.

But general reputation as to the character of such intercourse, after it had ceased, or the declarations and admissions of the parties made subsequent to that time, are not legal evidence to rebut the presumption of an actual marriage arising from such cohabitation and other acts, and to establish the fact that their children are illegitimate.

Declarations of parties and other attending circumstances, to be admissible in evidence as a part of the *res gestæ*, must be contemporaneous with the main fact under consideration and to which they are intended to give a character.

It is not a matter of course to commit the guardianship of the estate of a lunatic to those who are presumptively entitled to it upon his death, as his heirs or next of kin. But they will be appointed the committee of the lunatic's estate where it satisfactorily appears to the court that they are the persons who are the most likely to protect his property from loss.

Where a lunatic resides in another state and has property in the hands of his committee appointed at the place of his residence, that property is the primary fund for the support of the lunatic, and should be first applied for that purpose by the committee who has the control of his person.

THIS case came before the court upon exceptions to the report of a master, to whom it was referred to inquire and report who were the next of kin and heirs apparent of B. Taylor, a lunatic, and also to report who was or were the most proper person or persons to be appointed the committee of his estate. From the testimony before the master it appeared that Taylor was married to his first wife in 1797, and had by her four daughters; the youngest of whom was born in July, 1803, about seven weeks before the death of her mother. At the death of the first Mrs. Taylor, in September, 1803, Anne Connell, the reputed second wife, was living in the family and continued to reside there and to take care of the children. And a few days after the death of their mother she went with those children and Mr. Taylor to the residence of his father-in-law, in New-Jersey, and continued there two or three months while the yellow fever prevailed in New-York, and then returned with them to the city. In the summer or fall of 1804 Mr. Taylor introduced her to his friends and others as Mrs. Taylor. And from that time he publicly recognized her as his wife, and continued to cohabit with her as such, until he left his residence for England, in May or June, 1816. During all that time and afterwards, she was called Mrs. Taylor, and was reputed to be his wife, and was recognized by the children of the first marriage as their step-mother; they in addressing her always calling her ma. While she and Mr. Taylor were thus living and cohabiting together apparently as husband and wife, they had one son and three daughters, the eldest of whom was born in the latter part of May, 1805. And the names of all these children, with the times of their respective births, were entered by their father in his family bible, in connection with those of his children by the first marriage, as "*the family of Benjamin Taylor.*" About two months after he left for England Mrs. Anne Taylor had a fifth child, whose name was afterwards entered in the bible with the others, by Timpson who had married the eldest daughter of Taylor by his first wife. The eldest son

by the second wife accompanied his father to England to be educated there, and remained there until the return of his father who remained in Europe about thirteen years. During the whole of that period the second Mrs. Taylor continued to reside in the house of her reputed husband, in New-York, as the head of his family in his absence ; and all his children except such as were married were supported out of his property.   On his return to this country, in 1829, he came by the way of Canada and stopped and spent the ensuing winter at Albany, without visiting his family in New-York.   And it did not appear from the testimony before the master that he ever recognized Mrs. Taylor as his wife afterwards.

The parties who contested the validity of the second marriage, before the master, were the three youngest daughters by the first wife, and J. Hammond, the husband of one of them.   And those who supported it were the eldest daughter and her husband, together with the surviving children of the second marriage ; except the youngest son who resided in one of the southern states.   Upon the reference, the counsel of Hammond and his wife, and of the other two daughters who acted with them, for the purpose of showing that the intercourse between their father and the second Mrs. Taylor was not matrimonial but illicit, offered in evidence a letter written by her to him, in the summer of 1822, during his absence in Europe ; in which letter, as the counsel of the parties offering it insisted, she admitted that she was never married to him.   They also offered in evidence, for the same purpose, a mutilated paper, in the handwriting of the lunatic, purporting to be dated about eight years after his return from England, headed " Benjamin Taylor's advice to his executors, administrators and assigns concerning the property confided to their disposal ;" in which paper he declares that he and the second Mrs. Taylor were never married, but says he is certain that the omission of that *ceremony* is no sin when it arises out of circumstances like those in which he was involved.   The master rejected the testimony offered, as illegal and im-

proper ; as he did also several letters written by Taylor, the lunatic, after his return from Europe. He also refused to permit an enquiry as to the declarations of Mrs. Taylor upon that point, after her cohabitation with him had ceased.

The master decided and reported that the four surviving children of the second Mrs. Taylor, as well as the children of the first wife, were the next of kin of the lunatic, and would be his heirs at law if he were then dead. But still he reported in favor of the committee named by those who contested the validity of the second marriage, instead of the husband of the lunatic's oldest daughter, and the eldest son by the second wife, who were nominated as the committee on the other side. Each party excepted to the part of the report which was adverse to their claims before the master.

*T. Sedgwick,* for Hammond and wife, and the two sisters of Mrs. Hammond, who acted with her.

*J. Howe & C. Taylor,* for Timpson and wife and the three oldest children of the second Mrs. Taylor.

THE CHANCELLOR. The principal and most important question in this case, so far at least as the feelings of the children of the second Mrs. Taylor are concerned, although it is but incidental to the decision of the question who shall be the committee of the estate of the lunatic, is as to their legitimacy. Upon that question, however, from the evidence in the case, I think there is no ground to doubt that there was an actual marriage, by a contract *in præsenti,* between B. Taylor and Ann Connel, as early as 1804 ; although there is no proof that a marriage ceremony, in the usual form, actually took place. It is evident from the testimony that Taylor introduced that young woman, who then resided in his family, to some of his friends as Mrs. Taylor, about a year subsequent to the death of his first wife ; that at the expiration of about the ordinary period of gestation thereafter her first child was born ; and that for

the period of eleven years subsequent to that event he continued to cohabit with her as his wife and to hold her out to the world as sustaining that honorable relation to him. These facts alone would be sufficient to authorize any court or jury to presume an actual marriage between the parties, by a contract *in præsenti*, in the summer or fall of 1804, and that her intercourse with him was connubial and not meretricious subsequent to that period; even if there was reason to believe that an illicit connection had before existed between them. (*Fenton* v. *Reed*, 4 *John. Rep.* 52. *Rose* v. *Clark*, 8 *Paige's Rep.* 574. *Starr* v. *Peck*, 1 *Hill's N. Y. Rep.* 270.) And when, in addition to this, we take into consideration the other facts in the case, I think no one can doubt that there had been an actual and legal marriage between the parties previous to the birth of any of the children whose legitimacy is now attempted to be called in question by some of their sisters of the half blood. It appears by the family record kept by Taylor, previous to his departure for England in 1816, that he entered the names of the four children of the second wife who had then been born in such record with his own hand, in the same manner as he had therein before recorded the names of the children of the first marriage; except that those were entered therein as his children by Mary Barker—which was the maiden name of his first wife. It is also proved by many witnesses that all the children of the first marriage, even after they had arrived at womanhood, continued to recognize the second Mrs. Taylor as the lawful wife of their father; respecting and treating her as such, and calling her at all times by the familiar title of ma, as well after as before his departure for England. That fact is wholly inconsistent with the supposition that either of them then believed she sustained any other than that honorable relation to him and them. The testimony also establishes the fact that down to 1822 the general reputation existed, among all those who were acquainted with the family, that the lady who was living with Mr. Taylor was his wife. At least it does not appear to have been ever

1842.

In the matter
of Taylor.

questioned by any one after two or three months from the time when their cohabitation commenced, in the summer of 1804. The testimony of Joseph Taylor, the nephew, that it was the general reputation that she was not his wife, is so directly in conflict with the testimony of all the other witnesses who were acquainted with the parties previous to Taylor's departure for England, in 1816, that it cannot be credited. What he says as to her intercourse with Mr. Taylor having commenced immediately after the death of the first Mrs. Taylor, is also rendered altogether improbable from the fact which is testified to by other witnesses, that a very few days after the death of his first wife, B. Taylor went with Ann Connel and his children to the house of his father-in-law, in New Jersey, to reside, and remained there two or three months. If he was capable of such shameless conduct as some of his children are now attempting to prove against him by this witness, it appears to be wholly incredible that he should have taken his paramour into the house of the father and mother of the first Mrs. Taylor, immediately after committing the remains of that wife to the grave. Such conduct, too, is wholly inconsistent with the fact that Mr. Taylor has at all times sustained a fair character, and that his second wife was a kind and attentive mother to the children of the first marriage as well as to her own.

General reputation as to the character of the intercourse between these parties, created by the stories which had been set afloat about the time of the writing of the letter of July, 1822, was not legal evidence to rebut the presumption of the marriage arising from other facts in the case. As it was not a part of the *res gestæ*, it could not be legally used for the purpose of giving a character to the cohabitation which had terminated many years before. For the same reason, declarations or admissions of Mr. or Mrs. Taylor, made subsequent to that time, could not be legal evidence upon the question of the legitimacy of the children, who were born while their parents lived together and were holding themselves out to the world as husband and

wife. Declarations of parties, and other attending circumstances, in order to render them admissible in evidence as a part of the *res gestæ*, must be contemporaneous with the main fact under consideration and to which they are intended to give character. Thus, if a man and woman are cohabiting together, and the question to be decided is whether the character of her intercourse with him is matrimonial or meretricious, the declarations of the parties during the existence of such intercourse, the fact of their appearing in public with each other as husband and wife, of their visiting in respectable families, and of their being treated by their acquaintances and spoken of by them as sustaining that relation to each other, constitute a part of the *res gestæ*, showing the character of that intercourse to be matrimonial and virtuous. And cotemporaneous declarations and attending circumstances of a different character, would be legal evidence from which the conclusion might legitimately be drawn, that the intercourse between the parties was illicit and dishonorable.

I have, however, looked into the letter of July, 1822, and into the paper of 1837 said to be in the hand-writing of Mr. Taylor and to have been found among his papers, and I can see nothing in either to induce me to believe there was not a marriage in fact between these parties, previous to the birth of all of the children whose relationship to the lunatic is in question. From the letter of Mrs. Taylor, I infer that at the time she wrote it she had been led to suppose her marriage could only be established by the certificate of a clergyman, or magistrate, or by other direct proof; or at least by the admission of the husband that the marriage ceremony in the usual form had actually taken place. And from the paper said to be in the handwriting of Taylor, if it did not bear upon its face some strong marks of subsequent mutilation, as well as evidence of incipient insanity in the writer at the time it was written, it might be inferred that he supposed there could be no legal marriage except by the performance of the *ceremony* in the usual form; and that a private marriage con-

tract between the parties themselves was not a legal marriage. But if that paper is legal evidence of any thing, it goes strongly to confirm the presumption arising from the other proofs that there was in fact a contract of marriage between the parties themselves. For no other rational construction can be given to his declaration that he is certain the omission of the *ceremony* of marriage is no sin, when its omission arises out of circumstances like those in which he was involved.

The master having in this case arrived at the correct conclusion, that the children of the lunatic by the present Mrs. Taylor were equally legitimate with those by the first wife, the exceptions on the part of Hammond and wife and of the other two daughters who act with them must be overruled.

Although it is not a matter of course to commit the guardianship of the property of a lunatic to those who would be entitled to it, at his death, as his heirs or next of kin, there are in this case several reasons why the committee named by those who have supported and established the validity of the second marriage should be preferred to the committee proposed by the adverse parties. Timpson, one of the committee thus named, having married a daughter of the first wife, has a common interest with the other three children of that marriage in protecting the property against any unreasonable charges thereon for the maintenance of the second wife or her children. And he having also been well acquainted with the situation of the lunatic's property and affairs for the last 25 years, and his wife having a contingent interest in the estate, he will be more likely to protect the property from loss than a mere stranger. The other person named to act with him is the son of the lunatic by the last wife. He is, therefore, interested in preserving the property from loss. And being a lawyer, he will be able to save considerable expense to the estate, in the way of legal advice, in the management of the property. The exception to the report, so far as relates to the persons named by the master as committee of

the lunatic, must therefore be allowed.   And J. Timpson
and C. Taylor are to be appointed the committee of the
estate of the lunatic, both real and personal, which is situated in this state, upon their giving a bond, in the usual form, in the penalty of $12,000, with two sufficient sureties to be approved by Master Codwise, conditioned for the faithful performance of their trust as such committee.   The costs of the execution of the commission, not exceeding the amount specified in the 162d rule, are to be paid out of the estate, to the solicitor of the petitioners upon whose application the commission was issued.   And the committee are also to pay to the solictor of Timpson and wife and of the children of the second marriage his costs upon their petition for the appointment of a committee, and on the reference, and upon the exceptions to the master's report; after such costs have been duly taxed.

As it appears the lunatic is now in the state of Connecticut, and has a committee of his person and estate appointed there, no committee of his person will be appointed here for the present; nor will any provision for his support be made out of his property in this state until his property in the hands of his committee there shall have been exhausted, so far as to render a further provision necessary.   But the committee of his estate here are to be authorized to make such further provision for his support as they shall think necessary or proper, whenever they shall be satisfied that the estate in the hands of the committee in Connecticut has been exhausted.   The committee are also to provide for the support of the wife of the lunatic out of his estate; and to pay or allow such sums as have been necessarily and properly expended by others for her support, subsequent to the time when her husband was found to be lunatic in the state of Connecticut.

Order accordingly.