Chas. P. Daly, Ch. J.
This is a renewal of an application previously made to me for the transfer of Bomanjee Byramjee Colah, a lunatic, now in the care and custody of this court, to Bombay, in India, and, as the question of the power of the court to grant the application, and if it have the power, the further question, whether this is a case in which it ought to be exercised, are of a very novel character, it will be necessary, first to consider the circumstances under which the application arises.
Colah is a native of Bombay, of the age of twenty-six years, and a Parsee, a well-known race in India, of *211 peculiar religious tenets, habits and customs. He is a married man, with a wife and two children, natives of Bombay, who are now living there. In the year 1870, he left Bombay, taking with him personal property, in money and securities to the value of more than $100,-000, being all the property he possessed, and went to Calcutta, whence he proceeded to Europe, and in May, 1870, came to this city.
Upon his arrival here, he put up at the Fifth Avenue Hotel, and shortly afterwards circulated a business card describing himself as an “ Indiaman, a Parsee,” and “ New York Merchant,” and giving as Ms address, Room 45, Fifth Avenue Hotel.
From this hotel he removed in a short time to the Hoffman House, in this city, and it being apparent very soon after that he was insane, he was taken charge of by the police authorities and placed in the hospital at Bellevue.
As he was a total stranger, there being no one here who knew anything about him, and as he was supposed, from his description of himself as ££a Parsee Merchant,” and an “Indiaman,” to be a British subject, Her Britannic Majesty’s Vice-Consul in this city, J. Pierrepont Edwards, Esq., applied to this court for a commission of lunacy, and for the appointment of a committee to take charge of Ms person and of his estate.
A writ de lunático inquirendo having been granted, and it appearing upon inquisition that he was a lunatic, and had personal property in this city, proved upon the inquest to be about $40,000, the care of his person was committed to Conner Jones, Esq., and of his estate to" Nathaniel Jarvis, Jr., Esq. Upon the appointment of a committee of his person, Colah was transferred from the Bellevue hospital, to a private lunatic asylum, at Fishkill, and it subsequently appearing that Major A. Gk Constable had, from motives *212 of humanity, taken a very active interest in his case, that that gentleman had been for some years a resident of Bombay, was familiar with the religious views, usages and peculiarities of the Farsees, and could communicate with Colah in Mahratta, the only tongue in which he can or will converse since his insanity, it was deemed judicious by the court to transfer the future custody and care of him to Major Constable, by whom he was afterwards removed to the insane asylum at Flushing, where he is now under medical care and treatment.
It appeared upon the inquisition, as I have stated, that he had property amounting to forty thousand dollars ; but after Mr. Jarvis was appointed the committee of the estate, he found among his effects, in addition to the property already known to belong to him, a bill of lading for a large shipment of gold to this country, and with great difficulty and after many and diligent efforts, Mr. Jarvis traced this property into the possession of one of the proprietors of the Hoffman House ; the boxes containing the gold having in the meanwhile been opened, the gold sold, and the proceeds, amounting to sixty-four thousand dollars in currency, deposited in a trust company in this city, to the credit of the person by whom it was withheld, and who, by a resort to legal proceedings, was subsequently compelled to give it up.
This sum and one thousand dollars in gold in addition thereto, together with the property found upon the inquisition, amounting in all to one hundred and five thousand dollars, has been securely invested by Mr. Jarvis, under the direction of the court, in bonds and mortgages upon real estate and other securities bearing an annual interest of seven per cent., and an action brought by him is now pending, to recover the difference between the market value of the gold at the time when it was sold, and United States currency, *213 which, if successful, may add about eight thousand dollars more to the estate.
Colah having described himself as a Farsee merchant, Mr. Jarvis caused inquiries to be made of some Farsee merchants doing business in London, and through that channel discovered that he was a native of and had came from Bombay; whereupon Mr. Edwards, the vice-consul, caused further inquiries to be made in Bombay, which resulted in the discovery of his family and relatives, to whom he communicated a knowledge of his situation.
After receiving this information, two of his brothers and his wife united in and transmitted to Mr. Edwards a general power of attorney, authorizing him to take charge of Colah’s person and estate; under which, however, no action was taken by that gentleman until he received, through the American consul at Bombay, a communication from Heera Baee, the wife, requesting him to apply to this court, on her behalf, for the allowance of a certain sum to meet her present expenses, and for a fixed sum annually thereafter for the support of herself and children. This application having been heard, the court made the usual order for a reference, which is still pending, a commission having been despatched to Bombay that the court might have legal evidence of the necessary facts and such information as would enable it to fix upon a proper allowance; which commission has not yet been returned.
Fending this inquiry, Framjee Dosabhoy C. Wadia, the father-in-law of Colah, arrived in this city from Bombay, with a power of attorney from Heera Baee, the wife, authorizing him, on her behalf, to take charge of the person and property of the lunatic, to bring him and it to Bombay, and to make such application for that purpose, in her name, as might be necessary. Mr. Wadia accordingly presented a petition in her name, *214 asking that the person of Colah might be placed in his charge, and that the money, securities and other property belonging to Colah should be delivered up to him as the authorized agent and attorney of Heera Baee.
The application for the delivery of the property was opposed by the British vice consul, through his counsel, who read a formal protest, made by the two brothers of Colah before a notary in Bombay, to the effect that Mr. Wadia was not a proper person with whom to intrust either the person or the property.
The application to place the property in the hands of Mr. Wadia was denied, for reasons which have already been assigned, but the application to transfer Colah from the jurisdiction of this court rests upon entirely different grounds, which, as set up in the petition, are substantially these:
1. That his entire life, before he quitted Bombay, had been passed in that place; that he, all his relations and nearly a11 his connections and friends are Farsees, whose religious habits and customs are totally different from those of the people of the United States ; that there are no Farsees resident in this city, nor" any priest or minister of that religion in this country, and that in the event of his decease here, his remains would be deprived of the performance of certain rites and ceremonies which are deemed essential and vital by all persons of the religious faith in which he has been educated and has always professed.
2. That the difference between this climate and that of Bombay, and the difference in diet and the mode of living are unfavorable to his health, and have a prejudicial effect upon his mental condition.
3. That he has ceased to be violent or dangerous, and is now quiet and easily managed ; that he rarely speaks or takes notice of or exhibits any interest in what is passing around him ; that it is very difficult to arouse his attention, and that the only hope of restor *215 ing him lies in Ms return to his native country, the society and care of his wife, the presence of his children and the renewal of former associations with relations and friends in the scenes to which he has been accustomed from his infancy.
The first of these grounds, the importance in the religious belief of the Farsees of certain rites and ceremonies over the body after death, was denied by Major Constable, who testified that he was well acquainted with the religious faith, usages, ceremonials and practices of that people.
But the other grounds for the removal were supported by the opinions of Doctors Hammond and Vance, two prominent physicians in this city in the specialty of mental diseases.
Dr. Vance, after an account in detail of Ms condition, expresses the general opinion that Ms case did not require the restraints of an asylum; that his chance of ultimate recovery would be materially increased by his removal therefrom, and that no measure of a sanitary nature could be more appropriate than a return to his friends and the familiar. surroundings of Ms native country.
Dr. Hammond was of opinion that a sea voyage would be highly beneficial, and he declared that he could conceive of no cause so likely to prove injurious to him as his present separation from Ms family and country. Dr. Barstow, the resident physician of the asylum at Flushing, however, testified that in addition to the loss of his reason, he was afflicted with certain physical diseases of a very delicate and painful character, which, in his opinion, would be materially aggravated by his removal to Bombay and exposure to that climate. This conflict of opinion being unsatisfactory, I directed, with a view of obtaining something more definite and certain, that Dr. J. Meredith Clymer, a prominent practitioner in the specialty of mental *216 diseases, and Dr. A. G-escheidt, a general physician of high standing and long experience in this city, should be added to the three gentlemen above-named, and that the five together should examine Colah at the asylum, and after consultation, report in writing, whether in their judgment, his removal to Bombay would aid in the recovery of his health, the restoration of his mind, or promote his physical comfort and well being.
This examination and consultation was had, and the five physicians have unanimously reported that in their opinion, his removal to Bombay will not prove injurious to his physical or mental health, and in case he is properly attended, that it would be a very expedient measure.
Each physician, moreover, as required by the order which I made, gave his reasons in writing for his individual opinion, and the reasons given are, in my judgment, in the highest degree satisfactory.
It remains, then, to determine whether, this court has the power to direct the removal of Colah to a place beyond the limits of its own jurisdiction, a question that involves an inquiry into the nature and the extent of the authority vested in the court in cases of this description.
The jurisdiction assumed to be inherent in a State over that unfortunate class of persons within its limits, who are deprived of the use of their mental faculties, may be said to rest upon two grounds—First: Its duty to protect the community from the acts of those who are not under the guidance of reason; and, secondly, its duty to protect them,- as a class incapable of protecting themselves, which has its foundation in the reciprocal obligations of allegiance and protection, which extends to aliens and strangers who, while they are within the limits of a State, are under the obligations of a temporary and local allegiance, and are entitled *217 to its protection (1 Blacks. Com., 370; Cockb. on Nationality, 139; Case of the Princess Bariatinsky, 1 Ph., 375; Highmore on Lunacy, 18; Powell on Legeance and Protection, 169, 205).
In England^ whence onr law respecting idiots and lunatics is derived, the custody and care of this class of persons and their property is a part of the prerogative of the sovereign. Anciently, by the common law, it was intrusted to tutors, or more properly, curators, the curator being either the feudal lord or the next of kin, who in the case of an idiot, as his disability was permanent, took his land and the profits as the next in succession, subject to the obligation of supporting him during his life; but in the case of a lunatic, who may be restored to his reason, the curator simply had the custody of the estate under the obligation of applying the profits to his support, ánd retaining the excess that it might, together with the estate, be restored to him if he recovered his reason, and if not, that it might be secured to his heirs (Bracton, lib. 1, cap. 10, lib. 5, ch. 20 ; Fleta, lib.1, cap. 11, §10, p. 6; Mirror of Justices, 46, 74, 98, 123, 130; Year Books, 32 Edw. I., 272 ; Beverly’s Case, 4 Coke, 127; 1 Blacks. Com., 302; Fitz N. B., 232; Shep. Ct. Keeper, c. 22, 172; Bac. Discourse on the Laws of England, from Selden's Notes, 175, 176; Reeves’ History of the English Law, by Finlason, Introduction, xc. to ci., vol. 2, c. xii., p. 193, and note a).
But this practice being attended with great abuses, the king, as parens patriae, or common curator of the realm, assumed, as early as the reign of Henry I., ex-' elusive jurisdiction over this class of persons and their estates, and in the statute de prerogativa regis, passed in the reign of Edward II. (17 Edw. II., c. 9, 10), it was placed amongst the king’s prerogatives ; that statute declaring that the king should have the custody *218 of the lands of “natural fools,” and the profits, with the obligation of maintaining them, and that with respect to those who had had “ their wit and memory,” but had lost it, that the king should provide that their lands should be safely kept; that they and their households should be maintained out of the profits of their estates, and that the residue should be kept to their use, to be delivered to them when they came to “ their right minda jurisdiction or power which was not, as has been supposed, derived from the statute, but rests on the broader ground of the duty of a sovereign, as parens patries, to take care of those who, by reason of their imbecility or want of understanding, .are incapable of taking care of themselves, a principle introduced into the common law at a very early period from the Roman law of the twelve tables; Inst. B., tit. 1, 23, §§ 3, 4 ; Dig., 27, 10,1, 67 ; Maynz Elements du Droit Romain, tom. 1, § 106; Ortolan's generalisation du Droit Romain, 94, 95, 96, 97; Shep. Abm., part 3, p. 71; and which, upon the authority of Seeded, was one of the liberties and privileges secured by Magna Charta. (Bacon's Discourse on Selden's Notes, p. 176, 5 m).
This duty was first discharged by the king’s committing the custody of such persons and of their estates to proper committees in each, particular case ; but it was afterwards transferred to the lord chancellor, not in his capacity as chancellor, or as a part of his equitable jurisdiction, but as the king’s delegate in the exercise of this special jurisdiction (Fleta, p. 6; Reeves’ History of English Law, by Finlason, V. 2, C. 12, p. 193, and note a; Slaunf. Pr. Reg., 33; 1 Blacks. Com., 303 ; 3 Id., 427 ; Matter of Hele, 3 Atk., 635 ; Exp. Phillips, 19 Ves., 118, 122).
And the exercise of it in England, through many centuries, has resulted in the formation of a body of *219 precedents and rules constituting a distinct branch of jurisprudence.
So much of the law as formed a part of the king’s prerogative and was applicable under our republican form of government was, upon our separation from Great Britain at the revolution, vested in the people, and this especial jurisdiction was, in this State, by legislative enactments, transferred to certain judicial tribunals that have administered it in accordance with the rules and principles which the course of experience in England has pointed out as the most just, practicable and judicious.
This court has been one of those designated tribunals since 1854, having committed to it by statute the “ care and custody of the person and estate of a lunatic or person of unsound mind” when he resides in the city and county of New York (Code of Procedure, § 30 ; Laws of 1854, p. 464, § 6), an authority that carried with it all the power that was exercised in such cases by the lord chancellor in Great Britain, or by the court of chancery in this State, when this jurisdiction was entrusted exclusively to that tribunal. Justice Habéis has said, in John Mason’s Case, 1 Barb., 436, 441, that, as our statute has conferred this jurisdiction “ without restriction or limitation, the manner in which the control thus given is to be exercised by the court is entirely a matter of discretion.” Which, however, must be understood with this qualification, that it is a discretion regulated and restricted by certain rules and principles that have always been acted upon both in this country and in England.
It may be said in general terms, in relation to the nature and • extent of this jurisdiction, that the care and custody of a lunatic and of his estate necessarily imply both the right and the duty on the part of the court to do in respect to either whatever is most con *220 ducive to his interest. To see, in respect to his person, that he is maintained as comfortably as his unfortunate situation will admit of and his pecuniary resources will allow; that every thing is done that can be done by care, skill and,medical treatment to promote his. general health, or which will or may contribute to the restoration of his reason. His interest is the chief consideration, and, therefore, great care has always been taken not to intrust the custody of his person or his estate to those who may be pecuniarily benefited by his death, or whose interest it is to keep his property from diminishing, unless the officer exercising the power is satisfied that it would be to the .advantage of his bodily and mental condition, that those who stand in the relation to him of blood and natural affection should have the custody and care of him. ¡Nor will the interest of heirs or next of kin be at all considered in any outlay that may be made for his comfort or benefit or in determining what is most conducive,to his interest, either in the care of his' person or in the management of his estate.
“The king,” said Lord Hardwicke in Roberts’ Case (3 Atk., 309), “is quasi, a trustee for the lunatic’s benefit only.” Lord Macclesfield declared that in the eye of the-law, a lunatic is never looked upon-as beyond the possibility of recovery, and added, “It is his benefit and comfort I am to take care of, and not to heap up wealth for the benefit of his administrator or next of kin” (Dormer’s Case, 2 P. Wms., 265).
And Lord Nobtbington afterwards declared that, “In the management of the lunatic’s estate, the ruling principle is to do what is for the benefit of the lunatic” (Exp. Grimstone, Amb., 708).
Lord Loughborough, in adverting to the precedents and orders of previous chancellors in the exercise of this delicate jurisdiction, said that there was *221 one pervading principle, which, was that the trust was administered solely in the interest of the lunatic himself, that nothing could be more mischievous than to consider how his successor might • be affected by what was done, and that the chancellors had always shut out of their view all consideration Of eventual interests, and considered only the interest of the person under their care (Oxenden v. Lord Compton, 2 Ves. Jr., 72).
“A lunatic,” says Lord Eldon, in Chumley’s Case (1 Ves. Jr., 296), “is to have every comfort that his circumstances will admit of.” And he said in another case (Exp. Whitehead, 2 Meriv., 99), “the court has nothing to consider but the situation of the lunatic himself, always looking to the probability of his recovery, and never regarding the interest of the next of kin. . . The court does nothing wantonly or unnecessarily to alter the lunatic’s property ; but, on the contrary, takes care of it for his sake, that if he recover, he shall find his estate as nearly as possible in the same condition as he left it, applying the property in the mean time, as the court thinks it would have been wise and prudent in the lunatic himself to apply it, if he had been capable.” To which I may add the observation of Chancellor Kent, in Eunice Salisbury’s Case (3 Johns. Ch., 347), that “the governing principle in the management of the estate, is the lunatic’s interest, not that of those who may have eventual righ ts of succession” (See, also, Matter of Livingston, 1 Johns. Ch., 436; Matter of Taylor, 9 Paige, 611; Matter of Willoughby, 11 Id., 257 ; Matter of Heeney, 2 Barb. Ch., 326 ; Shep. Abm., pt. 3, p. 71).
. I have referred to the authority of these eminent judges, in the exposition of the nature of this jurisdiction, and of the principles which govern in the exercise of it, because it indicates the extent of the power with which the court, is clothed, and because what I *222 am asked to do involves a very heavy expenditure and charge upon the lunatic’s estate, which I should not impose unless it be clear that I have the power to do so, and that it is necessary for his benefit.
Acting upon the general principle, that the. court is empowered to do whatever is best for the lunatic himself, without any regard to the effect it may have upon the ultimate interests of others, it becomes very plain to my mind, that if the removal of him to a place beyond the limits of the jurisdiction of the court is, as a sanitary measure, essential to him and for his benefit, it is competent for the court to direct it to be done, and so far as it has the means, to see that it is carried out. It is true, that the custody of a lunatic is always given by the court to a committee, and that when this committee goes with his charge beyond the jurisdiction of the court, it has no longer any power or control over either ; but this does not constitute a sufficient reason for keeping the lunatic within the court’s territorial limits, when, in the opinion of those who are most competent to judge, the effect of so doing is prejudicial to his health, and tends to lessen the chances of his recovery. The court is to do what is for his benefit, and when it has taken every precaution, in seeing that he is entrusted to the charge of a person who, in the judgment of the court, will faithfully execute the trust committed to him, by taking the lunatic to the designated place, and who will fulfill every instruction given, for the faithful discharge of that delicate duty, the court does what it ought to do under the circumstances, and in.so doing, but carries out the philanthropic purpose which lies at the very foundation of the jurisdiction which it consents to give up.
I do not find in the reports any adjudged case covering the precise point here presented. In Re Hackett (3 Irish Ch., 375), the lunatic was transferred from Ireland to England. It was beyond the jurisdiction of *223 the chancellor having custody of his person, but the jurisdiction of each chancellor was a part of the prerogative of the same sovereign. In the Matter of Houston (1 Russ., 311), the lunatic was brought by his committee from Jamaica to England, for the benefit of his health, but by what authority is not stated, the only point in the case being whether another commission was necessary in England, which the court held was necessary. In Briggs v. Terry (Mylne & C., 675), an infant ward of the court of chancery was allowed, upon application, to go to France to see his father, in the custody of a person giving security that he would bring him back within a given period; and in Re Jones (1 Pr., 461, leave was given for a lunatic, under particular circumstances, to reside in Scotland, his committee, who resided in England, undertaking to bring him within the jurisdiction of the court whenever required.
Although these cases have some bearing upon the question before me, they are not precisely analogous, but there is an unreported case exactly in point, of which I have been advised by W. W. Yan Wagener, Esq., the professional gentleman by whom it was instituted. In the year 1840, John Grravillon, a well-known wealthy French merchant in this city and an alien, became insane, and was placed in the asylum at Bloomingdale. A commission of lunacy having been granted and a committee of his person and estate appointed, the committee, upon a certificate of the resident physician of the asylum, that an improvement of Mr. Grravillon’s general health might be expected from a sea voyage, applied to Yice-Chancellor McCoim for authority to send him to France in charge of a physician and two nurses, and to place him in a maison de sanie in Paris. The application was granted. He was taken to France and placed in an institution in Paris, where he died two years after- *224 wards, and the expense incurred was paid out of his estate.
My conclusion, after this review of the law is, that I have the power; and in respect to the expedience and necessity of its exercise, I regard the opinions of the five physicians as conclusive.
The views of Drs. Hammond and Vance have already been sufficiently stated. Dr. Clymer reports, that the unsoundness of mind with which Colah is affected is not of a kind to be aggravated by a voyage to Bombay, if he is properly cared for and attend ed during the voyage ; that there is a possibility of improvement of his disorder by a return to his own country, where he will be amongst friends and those of similar habits, language and religion, and that there is a lunatic asylum at Bombay which the doctor believes, from common report, to be equal to those in this country, and where Colah can be treated by equally skillful physicians ; in which report of Dr. Clymer Dr. Grescheidt fully concurs; and the resident physician of the'asylum, Dr. Barstow, is of the opinion, that if the same daily care and supervision can be continued during the journey, and the same relief and protection afforded him that he has hitherto received, the journey may be safely and advantageously accomplished.
Major Constable having consented to take charge of him, my instructions are that he shall take him by the next steamer which leaves here, to connect with a • steamer on the Pacific, to San Francisco. That from San Francisco he shall take him by steamer to Hong Kong, and from thence by steamer to Bombay, and upon his arrival at Bombay, place him in the institution referred to by Dr. Clymer. That the nurse that has hitherto had charge of him at the institution, at Flushing, shall go with him and continue the same care and attention he has hitherto bestowed, until he is placed in the institution in Bombay. It is suggested in a *225 letter of Dr. Barstow to Major Constable, that he should be accompanied by Dr. J. C. Godfrey, an assistant physician of the Flushing Institution. This will involve a heavy additional expense, amounting, upon the estimate made, to over four thousand dollars. I hesitate to subject the estate to this charge, it being my impression, that the services of an attending physician can be necessary during this journey only in view of Colah’s bodily ailments, and as there is a physician attached to each of the steamers, throughout the .entire route, he will have the benefit of their medical aid, which, in connection with the experience of the nurse, who has had him in charge for some time, and the supervision of the very intelligent gentle-who goes out as his committee, will, it appears to me, be sufficient to secure his safe transit from here to Bombay. That will itself involve a very heavy expense, to which must be added the remuneration of the various counsel, who have appeared in this proceeding, either on behalf of the British consul, the committees, or the wife in making this application. It may be, however, that I am mistaken in this matter, and that an accompanying physician is indispensable. If the five medical gentlemen, therefore, who have heretofore acted, will certify to me in writing, that it would not be safe to trust to the physicians attached to the steamers, and that, in their judgment, an accompanying physician is requisite, it will be so ordered.
Major Constable, upon his arrival in Bombay, will immediately notify the wife and relatives of the presence there of Colah, and if they, or some one of them, do not apply for the appointment of a committee, at the earliest possible period, then Major Constable is instructed to make the application himself, to the proper judicial tribunal or judge, within the jurisdiction, and will bring back with him, duly *226 authenticated evidence of the appointment, and of the asylum or institution in which Colah is placed.
If such an event should happen as the death of Colah, during the journey, then after discharging the last duties to his remains, Major Constable and the nurse will proceed no farther, but return to this city, and upon Major Cons'able’s return, he will make an official report, as a committee, of all that he has done.
The committee of the estate will be directed to pay out such sums as may be subsequently directed by order, to defray the expenses of the journey from here to Bombay, and upon Major Constable’s return, the court will adjust and fix upon a proper sum, to be paid to him out of the estate, for the discharge of this trust, which will not be regulated by the commissions given by Revised Statutes, to executors, administrators, or guardians (2 Rev. Stat., 93, § 58), as is the rule in committees of the estate (Matter of Livingston, 2 Den., 575; S. C., 9 Paige, 440), that measure not being applicable where there is a separate committee of the person ; but will be regarded as an actual and necessary expense, which would have to be paid out of the estate to some one, and is to be paid in this instance to the gentleman who is the committee of the person, for the reason that he can communicate with the lunatic in the only tongue in which he can or will speak, and is from that and many other reasons, a most appropriate one to whom to confide the execution of this most delicate and very responsible trust, which it would be unreasonable to expect him to discharge for the benefit of this friendless stranger, unless he is remunerated for his time and trouble. It will involve in the meanwhile, the abandonment of his business here, and is to be regarded like the cases of Annesley (Ambl., 78), of Evington (Jacob, 406, 2 Russ. 567), and of Ord (Jacob, 94), as an exceptional one to the general rule, that no compensation *227 will be allowed to the committee of a lunatic for Ms personal services (Anon., 10 Ves., 103; Shelf, on Lunacy, 163).
The final order may be settled upon one day’s notice.