In the Matter of DEMETRIUS SARIYANIS, an Incompetent Person.

Supreme Court, Special Term, Kings County, February 8, 1940.

*John D. Stephanidis*, for the petitioner.

*Paul H. Keller*, committee, in person.

*James A. Clark*, for the United States Veterans' Administration.

BROWER, J. The Consul General of the Kingdom of Greece stationed at New York city applies herein for an order permitting the repatriation of the above-named incompetent person. The Administrator of Veterans Affairs has appeared upon the motion and emphatically opposes the granting of the application.

The incompetent was born in Greece in the year 1901. He migrated with his mother to this country in 1914. During the World war he served for a period with the United States army, being honorably discharged on February 27, 1919. In 1922 he became afflicted with a mental disorder and was hospitalized in a veterans' hospital until 1928. During the latter year he was discharged from the hospital and thereafter lived with his mother until March 8, 1933, at which time he was committed to Kings Park State Hospital. Later during the same year his mother died. On September 2, 1936 the incompetent was transferred to Veterans' Administration Facility, Northport, Long Island, where he now remains. A committee, on January 30, 1934, was duly appointed for his estate which consists of certain cash assets and other securities.

In support of the application is filed the affidavit of an alleged aunt of the incompetent who resides in Athens, Greece, and who claims to be the nearest blood relative of the latter. She describes the nature of the home which she maintains in Athens; specifies that she owes no debts and declares that she will care in all necessary ways for her nephew in her own home or, if need arises, in one " of the exceptionally specialized sanitariums " located in Greece.

In the affidavit filed by the Consul General it is broadly stated that " petitioner believes it to be to the best interests of the incompetent to have him returned to Greece." It may be said at this

point, however, that no evidential basis is disclosed in either affidavit upon which to sustain the foregoing conclusion. The fatal significance of the omission will possibly become apparent upon a consideration of the views which I shall proceed to express.

The exercise of jurisdiction by the State over persons of unsound mind who are located within its territorial limits is founded not alone upon the underlying obligation of affording some measure of protection to the community, but also is motivated by the benevolent purpose of securing the welfare of the incompetent himself and the preservation of his property. The concept of such sovereign duty is of ancient origin, having been observed in the Roman Law of the Twelve Tables, whence it was accepted in England as a direct prerogative of the Crown. A learned and elaborate discussion of the historical development of the subject is stated in *Matter of Colah* (3 Daly, 529). (See, also, *Sporza* v. *German Savings Bank*, 192 N. Y. 8, 14 *et seq.*) The exercise of such jurisdiction was not confined merely to the care and custody of the physical person and property of incompetent nationals of the realm, but in like manner afforded a mantle of protection to resident aliens and strangers of unsound mind. The fact that the latter owed ultimate allegiance to a foreign sovereignty was regarded as immaterial. (See *Matter of Colah, supra*, p. 535, and authorities there cited.)

I introduce my present discussion with a brief allusion to the foregoing elemental principles to indicate that the court does not relax the vigilance with which it concerns itself in administering the affairs of an incompetent person within its jurisdiction even when, due to the latter's alien origin or natural blood affiliation or other similar circumstance, there are extraterritorial demands made for his custody. Suffice it thus to say that the court, when confronted with an application for the so-called repatriation of a foreign-born incompetent, seeks to ascertain whether the paramount interest of the incompetent himself, and not that of foreign relatives, justifies the desired result. In fact, it may be stated as a general expression of policy that " Great care should always be taken not to intrust the custody of the person of a lunatic or her estate to those who may be pecuniarily benefited by her death or whose interest it is to keep her estate from diminishing, unless the court is satisfied that it would be to the advantage of her bodily and mental condition that those who stand in the relation to her of blood and natural affection should have the custody and care of her." (*Matter of Andrews*, 56 Misc. 6, 7.) This statement of policy, which recognizes the incompetent's own interest as paramount to that of such persons as may have eventual rights of succession to his property, is comprehensive and applies to all incompetents within the jurisdiction

of the court, irrespective of whether they be of domestic or foreign domicile. The welfare of the incompetent himself in any case is controlling; the question of his particular domicile merely incidental. So also the demands or desires of expectant heirs or next of kin, or of friends or even of representative agencies of government, be they domestic or otherwise, are unimportant save as they may tend to disclose wherein lies the incompetent's true interest.

Thus is stated in the foregoing the pivot upon which will depend the determination of the court in applications which seek to effectuate the repatriation of an incompetent. Upon an application of such character the true motives of the foreign relatives will be subjected to meticulous examination. It will thus be sought to discover whether the request for repatriation is truly for the benefit of the incompetent or whether it is in fact a subtle effort to promote primarily the ultimate self-interest of the foreign relatives.

Unless the moving party, therefore, is capable by proper, precise and definite proof of directly negativing any fact, intimation or inferable suspicion suggestive in the least of the latter possibility, the court will refuse to permit such repatriation. The burden of clearly and convincingly establishing that the interests of the incompetent, and such interests alone, justify the order of repatriation, rests squarely upon the party seeking the same. The order in no event should be made to depend solely upon the fact of an original or even a continuing allegiance owed by the incompetent to a foreign sovereignty, nor upon the mere physical fact that in such foreign land the incompetent retains ties of bloodship. Such circumstances do not *per se* demonstrate wherein lies the paramount interest of the incompetent.

The general policy governing applications of this character was disclosed by the decision of the English court in the *Princess Bariatinski* case (1 Phillips, 375). Princess Bariatinski, shortly after her birth in Russia in the year 1807, was sent over by her father to England and committed to the care of certain relatives. Subsequently she became afflicted with a mental disorder. In 1843 her half-brother, Prince Bariatinski, came to England and claimed the custody and management of the princess' person and property, insisting that by the laws of Russia he was entitled to it as the head of his family. It appeared that at the time the fortune of the princess was stated to consist of about £30,000 in British funds and some real estate in Russia. The Lord Chancellor was of the opinion that the legal domicile of the princess was immaterial to the question of the court's jurisdiction. He also remarked that it was the duty of the court " to throw protection around the person and property of an individual in this situation." He further observed that

" the Crown does not take possession of the lunatic's property for its own benefit; but it takes it by its officers, for the purpose of applying the income to the party's maintenance and accumulating the surplus for him in case he recovers, or apply it according to the directions of his will, if he happened to have made one before he became insane. What can be more proper, what more humane, what more consistent with the general character of the Law of England than such a course?" In order to ascertain the paramount interest of the incompetent, the Lord Chancellor then ordered that the matter be set down for a proper hearing.

The care which is observed in this State upon similar applications is disclosed in *Matter of Colah* (3 Daly, 529). Colah was a native of Bombay, India. He came to this State in 1870, bringing with him personal effects to the value of more than $100,000. He left behind in India a wife and two children who were natives of Bombay. Subsequent to his arrival in this country he was duly adjudged a person of unsound mind. Thereafter the wife executed a power of attorney in favor of her father-in-law who thereupon sought an order permitting the repatriation of the incompetent. Upon the application it was shown that his retention in this country possibly would be prejudicial to his health; that his mental condition would not be aggravated by a voyage to Bombay; that there was a possibility of improvement of his mental disorder by a return to his own country where he would be among friends and those of similar habits, language and religion; that there was a lunatic asylum at Bombay which the doctors believed, from common report, to be equal to those in this country, and where the incompetent could be treated by equally skillful physicians. A consideration of the full report of this case will indicate the meticulous care which was observed by the court before it ultimately decided that the incompetent should be returned to the land of his origin. (See, also, *Matter of Santora*, 253 App. Div. 208.)

I may add that in considering the propriety of directing an incompetent's repatriation, some attention should be devoted to the latter's own possible inclination in the matter. It would seem at first blush that if the subject of such inquiry does not enjoy lucid intervals from time to time but is afflicted with a constant and complete mental derangement, overwhelming his intelligible sense of selection, his particular choice upon the issue would be difficult, if not impossible, of ascertainment. Analytical reflection upon the question generally, however, reveals that the ascertainment of the incompetent's own probable choice in the matter need not present insuperable barriers. Such desire may well be inferred, among other things, from facts and circumstances occurring prior to his

mental affliction which disclosed either *animus revertendi,* an intention ultimately to return to the domicile of his origin, or *animus manendi,* an intention to remain permanently in the land to which he has migrated. In accordance with our national public policy, by express provision of law, we specifically recognize that the right of expatriation is a natural and inherent prerogative. (U. S. Code, tit. 8, § 15. See, also, *United States ex rel. Scimeca* v. *Husband,* 6 F. [2d] 957.) We thus have abandoned the earlier common-law concept which denied a man the right, by selecting an extraterritorial domicile, to renounce thus the ties which bind him to his native land. (See *Shanks* v. *Dupont,* 3 Pet. 242, 246; *Inglis* v. *Sailors Snug Harbor,* Id. 99, 156; *Ainslie* v. *Martin,* 9 Mass. 454.)

In my opinion relevant circumstances which antedate the incompetent's mental affliction may well indicate whether or not the latter elected truly to expatriate himself, as to his native land, by selecting his residence within this or sister States or whether the selection thereof was merely for transitory purposes. Upon an inquiry of such character an examination as to the nature of the incompetent's former employment, his prior mode of life, his social proclivities and other related circumstances may be given cogent operative significance in lieu of the incompetent's present inability to express his own choice upon the subject. If it be found upon such inquiry that the acquisition here of a domicile by the incompetent was predicated upon motives of permanency, which evidenced a choice for a complete expatriation from his native land, the court should be loathe to substitute its affirmative discretion, destructive of that choice, by ordering a repatriation to that very land.

Due to the increasing number of applications for the repatriation of incompetents, I have thought it advisable to express my views quite fully with the hope of arriving in a general way at some applicable rule for guidance in the future.

Upon the instant application the petitioner has failed to sustain the burden cast upon a foreign relative or governmental representative of demonstrating to the satisfaction of the court that the interests of the incompetent will be best served by ordering his return to Greece. On the other hand, sufficient facts have been disclosed in the opposing affidavit to suggest the rather strong inference that after his arrival in this country, and prior to the mental affliction, the incompetent himself renounced any desire to become thereafter a voluntary repatriate.

Under the circumstances, the application is denied.