## Susan Dickerson *et al. v.* W. N. Brown.

1. Husband and Wife—Marriage.—The relation of husband and wife originates in contract, which, when executed, imposes upon the parties new relations to each other and to the public. This contract in some respects is unlike other contracts, particularly in this, that it is indissoluble, save in the mode pointed out by statute. 1 Bishop, Mar. & Div., 272. It is considered a civil contract. Ib., 19. It may be entered into by competent parties by mutual agreement or assent. Ib., 121, 272, 279. A marriage, valid at common law, is good, notwithstanding the statute, unless the statute, contains express words of nullity. Ib., 583-284. The text books, consider clerical intervention unnecessary at common law, and this, says Bishop, may well be deemed the American doctrine. Ib., 279; 2 Kent, 87.

2. Same—What Constitutes a Marriage.—With reference to the consent necessary to consummate marriage, nothing more is needed than that, in language which is mutually understood, or in any words declaratory of intention, the parties accept of each other as husband and wife, and the doctrine is laid down, that if the words do not of their natural meaning, or by common use "conclude matrimony," yet if the parties intend marriage, and their intent sufficiently appears, they are inseparably husband and wife, not only before God, but also before men. 1 Bish., Mar. and Div. 229. Consent may be either verbal or written, and where there was no ceremony, but the parties merely live together as husband and wife, for many years, they were held to be, in law, married. Hicks v. Cochran, 4 Edw., ch., 107. A maxim of law' is *consensus, non concubitus facit matrimonium*

3. SAME—CONSTITUTIONAL PROVISION.—"All persons who have not been married, but are now living together, cohabiting as husband and wife, shall be taken and held for all purposes in law, as married, and their children whether born before or after the ratification of this constitution, shall be legitimate, and the legislature may by law, punish adultery and concubinage." Const. Miss., art. 12, sec. 22.

4. SAME—CASE IN JUDGMENT.—Complainants filed their bill in the chancery court, alleging that they are the children and heirs at law of L. P. Dickerson, deceased, who died February 2, 1871, leaving an estate, real and personal, described in the bill. That the deceased and their mother never were joined in the bonds of matrimony by any ministerial performance of any marriage ceremony, because at the time their intercourse commenced, (in 1855,) marriage between a white man and a colored woman was prohibited by law ; that their father loved their mother devotedly, that they were married in heart, and by the laws of nature and of love; that their father and mother lived and cohabited together as husband and wife; that complainants are the fruits of this union, and that the intercourse continued until the death of their father. That their father and mother continued to live together until the ratification of the constitution, and their father rejoiced when he learned the provision of it that he might do justice to their mother, and that a public ceremony of marriage would be unnecessary. That defendant has possession of the estate of their father, and they seek a recovery. To this bill was filed a demurrer, which was sustained. *Held :* That the court erred in sustaining the demurrer to the bill.

Appeal from the chancery court of Coahoma county. Hon. E. P. REED, Chancellor.

The facts in the case fully appear in the opinion of the court.

*H. H. Chalmers,* for appellants :

No particular form or ceremony is necessary to constitute marriage in this State. A marriage *per verba de presenti,* by the parties themselves, is as good as though solemnized under a marriage license, by a clergyman or civil magistrate. No special words, either spoken or written, are essential; anything that manifests a present desire or intention, then and there to constitute between the parties, the marital relations is sufficient. It may be done by signs or by letter. The English act, 726 Geo., 2 Ch., 33, (1753,) has been adopted, in spirit and substance, in but few, if any, of the United States. By that act, (known as Lord Hardwick's) a ceremony, *in facie ecclesiae,* is necessary to create a valid marriage. Such is not the law of this State. Hargroves v. Thompson, 31 Miss., 211 ; 1 Bish. Mar. and Div., 279, and authorities cited.

Nor is the principle, that a valid marriage created by any words or acts which signify or declare a then present purpose and intention to create the relation, changed by any statutory regulation prescribing, by whom and in what manner, marriage shall be performed.

Even though the statute declares that marriages shall be solemnized *in no other manner, and by no other person than those enumerated*, it will not render a marriage void which has been otherwise performed. No statutory regulations concerning marriage are essential to the validity of the marriage, unless there is an express declaration that those which are not so celebrated shall be *void*. There is no such declaration in our statute. Hargroves v. Thompson, 31 Miss., 211; Pearson v. Howey, 6 Halsted, N. J., Rep. 12; 1 Bish. on Mar. and Div., § 283 to 289.

But for her servile condition and her race, then the deceased, Dickerson, might, at any time, have contracted matrimony with the mother of appellants by any words or signs, mutually used by and between the parties, which signified a present intention and desire on the part of both, then and there to create the relation of husband and wife, more especially if the words were followed by cohabitation and copulation. The bill does not set up that such words actually were used, because at the date of the commencement of the intercourse, such marriages were prohibited and held to be criminal in the eyes of the law, in consequence of the woman being a negro and a slave. It is admitted by us that the intercourse was criminal, and the marriage void in its inception. But this was solely by reason of the incapacity of the woman. It is alleged that both parties earnestly desired that it should be a marriage, valid in law, as it was in love, and that they cherished each other, and lived and cohabited together as husband and wife. Nothing, therefore, save the woman's legal incapacity prevented this from being a valid marriage.

That incapacity was removed in the lifetime of Dickenson: first, by the fourteenth amendment to the constitution

of the United States, which made her a citizen, and protected her in her rights; second, by the act of our own legislature, entitled an act to repeal certain laws relating to slaves, free negroes and mulattoes and freedmen, and for other purposes, approved June 14, 1870, to the third section of which attention is called. The woman's incapacity being thus removed, that living and cohabiting together as husband and wife, with the earnest purpose and desire on the part of both that the marital relation should subsist between them, ceased to be adulterous, and became a valid and legal marriage by the subsequent cohabitation. No subsequent ceremony was necessary. A marriage which is invalid on account of the incapacity of parties, becomes valid by cohabitation after such incapacity is removed. The marriage of a lunatic, though void at the time, becomes valid by cohabitation after the mind is restored. 1 Bish. Mar. and Div., 142; Cole v. Cole, 5 Sneed (Tenn.) Rep., 57. The same is true as to the marriage of an infant beneath the age of consent. 1 Bish. Mar. and Div., § 150; 1 Blackstone Com., 436; Kownce v. Wallace, Jones' (N. C.) Rep., 194. The marriage of slaves was held to become valid by their cohabiting after emancipation. Girard v. Lewis, 6 Martin (La.) 559. This last principle has been disputed in 6 Jones N. Car. R., 235, but it is in accord with principle and is undoubtedly correct. The North Carolina court was misled by the indisposition of a slave State to accord civil and property rights to free negroes.

When the marriage is invalid because of the fact that one of the parties has a former matrimonial partner living, the law will presume, if cohabitation continues after the death of such other living partner, that a valid marriage took place after the removal of the impediment. 1 Bish. Mar. and Div., § 508. Mr. Bishop says there are States where no formal ceremonial solemnization is necessary, if it can be shown that the parties desired the connection to be matrimonial and then cohabited after the removal of the impediment, even for one day. This should be taken, not as

a *presumption* of marriage, but as constituting *actual marriage itself.* In the case at bar, the matrimonial desire is alleged by the bill, and admitted by the demurrer. In this State, no ceremonial solemnization is necessary, and the connection continued to exist several years after the removal of the impediment.

In case of Donnelly v. Donnelly, 8 B. Monroe, 113, there was, indeed, a ceremony attempted, but the man, at least, knew that it was void, because of the fact that his lawful wife was still living, and yet, notwithstanding that this made the intercourse adulterous in its inception, it was held to have been validated by cohabitation after the death of the first wife.

It must be borne in mind that all the allegations of the bill are to be taken as true, and these facts undoubtedly constitute marriage. We insist, however, that the allegation that the parties gladly accepted the provisions of the constitution was unnecessary. If the parties were, at the date of the ratification of the constitution, actually " living together, cohabiting as husband and wife," with the purpose, desire and intention of occupying that relation to each other, then the *organic law* of the State solemnly ratified and validated this imperfect union, and pronounced them man and wife in the sight of man, as they already were in the sight of God and in the hearts of each other. The law, in its highest type, pronounced the words, more potent than those of any priest, which made them flesh of one flesh. This constitutional solemnization of the rites of matrimony can neither be disputed nor questioned by the parties nor by any claiming under them. Had they separated ten days after the ratification of the constitution, they would, nevertheless, have been married. How much stronger the argument when it is alleged that they continued to " live together and cohabit as husband and wife until death dissolved the union." It will be remembered that we are not contending for an involuntary marriage, forced by law upon unwilling hearts. It is

only as we say, a constitutional declaration that no further ceremonial between parties living together as husband and wife, with whom there has heretofore been an impediment, but that said impediment is, by the adoption of the constitution, removed, and said parties thereby pronounced husband and wife. This amounts to a legal estoppel which cannot be gainsaid. Parties so circumstanced can no more be heard to say that they are not married, than if they had been joined together by the most solemnn rites of the church and State.

It has been held, that when parties went through the forms of marriage and afterward consummated it by copulation, they could not be heard to say that they had no intention of marriage, that the form was a ruse and the copulation adultery. They were held to be estopped, and to be married by operation of law, past their own disputing. Bishop, § 238 to 243. In the case at bar, the constitution was the formal ceremony. Having continued to cohabit under it, they are estopped from denying their marriage and setting up their adultery.

It is urged however, that this constitutional provision is applicable to negroes alone, or at all events not to alliances between blacks and whites. There is not a syllable in the constitution or the laws of the State, to countenance this idea. It may be that the very great number of cases, supposed to exist among the negroes, prompted its passage, but there is nothing to limit it to them. It is a general provision and covers all who fall within its scope. Indeed there is no blacks and no whites in this State, in contemplation of law.

The State only knows its citizens, as her children, and recognizes no difference between them. There is not in the constitution, nor in the whole body of the new Code, the slightest allusion to white men or to black men as such. All laws apply to all; all rights belong to all; all restrictions are imposed upon all. Indeed it might be argued, that this provision was intended to apply more especially to whites than blacks.

All the imperfect and inchoate marriages among the blacks had been cured by sec. 3, of an act to confer civil rights on freedmen, and for other purposes, approved November 25, 1865. Acts of 1865, p. 82. The validity of this law is recognized. Sec. 2, of the schedule of the constitution of 1868; see. Rev. Code, 1871, p. 668.

It had also been declared valid by the principles enunciated in case of Thomas V. Taylor, 42 Miss., (the cotton money case.) The marriage of the negroes having already been validated by this act of November, 1865, and that act having been itself continued in force by the schedule of the new constitution, it may well be said that the article under discussion, applies more particularly to the whites than to the blacks.

*A. H. Handy*, on the same side, filed an elaborate brief, and argued the case orally. The brief is too long to publish, and too complete to be condensed.

*Landon C. Haynes*, for appellees:

Was the *status* of the parties as set forth in the bill, matrimonial, or one of *concubinage?* Does § 22, art. 12, Const. Miss., legalize such " marriages of love," as that disclosed in the bill? Or does not this section expressly vest the power in the legislature to punish such cohabitation and illicit intercourse, as set forth in the bill, between these parties, as a state of concubinage? Const. § 22, art 12.

The bill alleges, that from the time the intercourse of the parties commenced, in 1855, to 1st of December, 1869, marriage between a white man and a colored woman was prohibited by law. Knowing then that marriage was impossible and prohibited by law, under heavy penalties, I maintain that the bill shows that the intercourse was intentionally criminal, *mala fides*, from beginning to end; not matrimonial, as husband and wife, but meretricious, as keeper and mistress. 1 Bish. Mar. and Div., § 436, §506, §507.

Not being married, and with a knowledge that it was prohibited, they were guilty of fornication. Code, Miss., § 4, p.

573. See also, 3d sec. act of November 25, 1865, ch. 4. See the act, p. 82.

The new constitution left this act in full force, until the 14th June, 1870, when it was repealed. 2 Schedule Const.; act of 1870, p. 2.

It therefore follows, that those persons did not, and could not live together and cohabit as man and wife, as is shown on the face of the bill, because they knew, and all the world knew, they were not married and could not be, under penalties, etc.

Their cohabitation, therefore, raised no presumption that they lived together as husband and wife, either *de facto or de jure*, but the laws of the land and the facts stated in the bill, conclusively refute any such presumption. The conclusion from the statements of the bill is irresistible, that they knowingly and willfully chose to live and cohabit together, in a state of fornication and concubinage, as *roue* and *mistress*, and not as husband and wife, because, as marriage between a white man and a negro woman, from cohabitation will not be presumed, so neither will, living together as husband and wife, be presumed from the cohabitation of a white man and negro woman. But their disparity of rank and the degredation involved, rebut any such presumption, if not forbidden even by law. 1 Bishop. Mar. and Div. § 438, 260, 512; Armstrong v. Hodges, 2 B. Monroe, 70; 2 Kent, 258.

The mere fact that a man and woman lived together in illicit intercouse as did these parties, is not sufficient to raise the presumption of marriage, or to prove that they lived together as husband and wife. Such presumption only arises from a matrimonial cohabitation where the parties not only live together, but also hold themselves out to the world as sustaining that relation to each other. This, these parties never did. See matter of Taylor, 9, Paige, 614 n.; Rose v. Clarke, 8 Paige, 581-582; Stevenson v. McReary. 12 S. & M., 56; Henderson v. Cargill, 31 Miss., 367, 409 and 419.

Nothing short of the allegation of *both* states of fact, could

rebut the presumption that a white man and a negro woman did not live and cohabit together as man and wife.

But the bill shows, that he lived with her as master while she was a slave in concubinage, and as a keeper when she became a freed woman, until the ratification of the constitution. They occupied different rooms. She went to his chamber and bed, and slept with him two-thirds of her time, as his colored concubine, in a state of fornication, as the bill shows. 9 Paige, 616, 617; 8 Paige, 581, 582.

· Before the late universal emancipation of the colored race in the south, it was everywhere held by the courts of the slave States, that slaves being property had no legal capacity to make a contract of marriage in a legal sense. But that in moral contemplation they could consent to a marriage, which made their cohabitation as man and wife very different from indiscriminate sexual intercourse or concubinage among free men and free women. Girod v. Lewis, 6 Mart. (La.), 559; Howard v. Howard, 6 Jones, 236; 1 Bish., Mar. & Div., §§ 154, 159, 162.

Whether section 22, of art. 12, intended to *legalize* the illicit status and commerce of L. P. Dickerson and Ann, the colored concubine, or to *legalize* the qualified and *de facto* marriage of the colored population and freedmen of Mississippi, at the time of the adoption of the constitution. This clause must be construed in the light of history; the known habits, manners and institutions of the slave States, which led to it; and the antecedent mischiefs affecting the marriages of the colored people of Mississippi, constituting a majority of the whole population of the State, as well as by the well settled rules of interpretation, in order to discover the intention of its framers. We must also, therefore, have regard to the words, the context, the subject matter, the effects and consequences, or the reason and spirit of this fundamental law. 1 Black. Com., 59, 60; 1 Story Com. on Const. U. S., § 400.

Vattel lays down the rule, that every interpretation which

leads to absurdity ought to be rejected, and what is shameful is not to be presumed.) Vattel, Book II, ch. 17, § 282.

An interpretation which would lead to such a gross *absurdity* and to such shameful consequences, as that the convention intended to include within this clause, and illicit cohabitation of a white man and colored woman living in open violation of the criminal law, cannot be made by the courts. Such an interpretation would have the effect to convert the concubinage and moral turpitude of the parties into the binding force of legal marriage and virtuous cohabitation, without their consent, in derogation of public decency, decorum and good manners. This court will never presume the framers of this section (22) had any such intention.

(On the contrary, the convention that framed the new constitution, as is shown by the *context* of the clause in question, had in view *two classes* of persons.)

*One* class, living and cohabiting as husband and wife by marriage *de facto*, which relation it was intended to legalize.

And *another class*, as shown in the last line of section 22, living in adultery or concubinage, like L. P. Dickerson and Ann; which class it was intended to exclude from the benefits bestowed on the other, because the convention, in that last line of the section, vested the legislature with express power to punish, by law, the crime of adultery or concubinage. See ch. —, § 22, art. 12, Const., p. 47; 1 Black. Com., pp. 60 and 61.

The facts, the mischiefs, the marriage relations, and the legal condition of the colored people as shown by history, demanded this constitutional provision, legalizing their matrimonial *status*, and legitimising their children, while the concubinage of the white man and colored woman, or of the black and white, demanded criminal punishment, and, therefore, section 22, article 12, made provisions for both. 1 Story on Const. U. S., § 402; 1 Bish. Mar. & Div., §§ 154, 158; Howard v. Howard, 6 Jones, N. C., 236.

For the foregoing reasons, that part of section 22 which relates to marriage must be construed to apply to the colored

race who cohabit as husband and wife, and that part of it which grants the power to legislate for the punishment of concubinage, to such persons as the putative father and mother of complainants.

Not having shown on the face of the bill, and by the law of the land, that the complainants are the next of kin and heirs at law of L. P. Dickerson, it was properly dismissed by the court below.

The bill shows on its face that P. C. Dickerson is a necessary party to the suit, because it shows that L. P. Dickerson left no children except complainants, and that P. C. Dickerson, who was his brother, and W. N. Brown, the son-in-law of said P. C. Dickerson, by false representations that they are the next of kin and heirs at law of L. P. Dickerson, deceased, have obtained possession of all the personal property, and an order of the chancery court of Coahoma county to work the plantation described in the bill.

The rule is, that whenever a deficiency of parties appears on the face of the bill, the want of the proper parties is a cause of demurrer. 1 Dan. ch. pr., p. 334; Story's Eq. Pls., § 541.

*W. & J. R. Yerger*, on same side, filed an elaborate brief, and argued the case orally.

TARBELL, J., delivered the opinion of the court:

Susan Dickerson and Oliver Dickerson, complainants, filed their bill of complaint in the chancery court of Coahoma county, in July, 1871, against W. N. Brown and Mary Ann Dickerson, setting forth that the complainants are the children and heirs at law of L. P. Dickerson, deceased, late of said county, who departed this life, February 2, 1871, leaving a large real and personal estate, particularly mentioned in the bill; that Mary Ann Dickerson, one of the respondents, is the mother of complainants; that their father, said L. P. Dickerson, and mother, said Mary Ann Dickerson, " were never joined in the bonds of matrimony by any ministerial performance of any marriage ceremony, because, at the time

when their intercourse commenced, marriage between a white man and a colored woman was prohibited by law, but that their father loved their mother with all the ardor and devotion of a true lover, and while the laws of the State forbid the solemnization of the marriage rites between them, they were married in heart and by the laws of nature and of love ; *that their father and mother lived and cohabited together as husband and wife;* that the complainants were the fruits of this union, and were always recognized by their father as his children, and they lived with him and their mother, and continued to honor and obey him as their father until his death ; that the intercourse between the father and mother of complainants began in 1855, and continued until his death ; that he never attempted to marry any woman of his own color; that he remained true to his love, and when the bonds of slavery were stricken from their mother, and when the new constitution of the State proposed and legalized all such marriages of love, by declaring that all persons who have not been married, but are now living together and cohabiting as husband and wife, shall be taken and held, for all purposes in law, as married, and their children, whether born before or after the ratification of this constitution, shall be legitimate; their father and mother continued to live together as before, *until the ratification of the constitution; that their father joyfully embraced this opportunity of doing justice to her who had been so many years the partner of his bosom,* and to the children of his loins; *that after he had seen the provisions of the constitution, and knew the effect of a continuance of his intercourse with their mother, he rejoiced that a public ceremony of marriage would be unnecessary; that he could then,* in the quiet and unobtrusive manner *legalize his intercourse with their mother into matrimony;* that they continued to live together and cohabit as husband and wife, until the new constitution was ratified; that a brother of their father and one W. N. Brown, have obtained possession of all the personal property of their father, and have also obtained an

order to work the plantation, and are working the same; that the bond of the administrator is insufficient; that the widow is entitled to dower; and that the administrator has sold a crop of cotton, etc., and the bill prays for a discovery as to how much and what kind of property has come to the hands of the administrator, belonging to the estate, and what disposition he has made of it; that the administrator be required to give additional security on his bond; that a receiver be appointed; that restitution of the property, after payment of debts, be made; and for general relief, etc.

The respondent, Brown, appeared and demurred to the bill, stating the following grounds therefor:

1. The complainants do not show that they are the heirs of L. P. Dickerson.

2. J. C. Dickerson, referred to in the bill, is a necessary party thereto.

3. Because a discovery is sought before the expiration of six months after the grant of administration.

4. Mary Ann Dickerson is improperly made a party.

The first, second and third grounds of demurrer were sustained, and the bill dismissed. From that decree this appeal is prosecuted. The decree sustaining the demurrer and dismissing the bill, constitutes the basis of error. A somewhat novel case is thus presented, arising out of an anomalous condition, though its solution is regarded as simple. In its consideration, the views of those learned in this branch of the law have conduced to no uncertain or doubtful result.

The American doctrine undoubtedly is, that the relation of husband and wife originates in contract, which, when executed, imposes upon the parties new relations to each other and to the public. In some respects, this contract is unlike all other contracts, particularly in this, that it is indissoluble, save in the mode pointed out by statute. 1 Bishop Mar. and Div., 272. Marriage is hence considered a civil contract. 1 Bish. M. and D., 19; and may be entered into by parties of suitable age and mental capacity, by

mutual agreement or assent. 1 Bish. M. and D., 121, 272, 279. The doctrine is considered established, that a marriage good at common law is good notwithstanding the existence of any statute on the subject, unless the statute contains express words of nullity. Ib., 283, 284. Chancellor Kent, Judge Reeve, and Prof. Greenleaf, in their text-books, have considered clerical intervention to be unnecessary at the common law; and this, says Bishop, may well be deemed the American doctrine. Ib., 279; 2 Kent, 87; Reeve Dom. Rel., 195, *et seq.;* 2 Greenl. Ev., § 460.

Repeating the foregoing rule in slightly different language, Bishop, vol. 1, § 289, says: " No particular form of words, therefore, is essential to the solemnization of marriage, unless the statute not only requires the words to be used, but declares the marriage to be null where they are not used."

Referring to statutes requiring a license and other ceremonies, it has been held, that "these directory provisions, though prohibitory, and even penal with respect to the officers, have not been regarded as affecting the validity of a marriage otherwise legal." 1 Bish. M. & D., 284; 17 B. Monroe, 193; 2 Watts, 9; 5 Rawle, 209. And this is believed to be the correct rule.

With reference to the consent necessary to the consummation of marriage, it is said, "nothing more is needed than that, in language which is mutually understood, or in any mode declaratory of intention, the parties accept of each as husband and wife. And Swinburne lays down the doctrine that, if the words do not of their natural meaning, or by common use, " conclude matrimony," yet, if the parties intend marriage, and their intent sufficiently appears, " they are inseparably man and wife, not only before God, but also before men." 1 Bish. M. and D., 229. And this " consent may be either verbal or written; and where there was no ceremony, but the parties merely lived together as husband and wife for many years, they were held to be, in law, married." Ib., Hicks v. Cochran, 4 Edw. Ch.. 107.

A maxim of the civil law, equally also of the ecclesiastical, of the common, indeed of all law, is *consensus non concubitus, facit matrimonium* (consent, not cohabitation, makes marriage.) Hence, when parties, capable of intermarrying, agree to present marriage, the matrimonial relation is made thereby complete. 1 Bish. M. and D., 228. If, practically, a man and woman recognize each other as, *in substance*, (to use an expression which at least can be understood), husband and wife, though they attempt to restrict the operation of the law upon their relation, the law should hold them—public policy requires this, the peace of the community requires it, the good of society demands it—to be married persons, unless some statute has rendered the observance of some form of marriage necessary. Ib., 225.

Divested of verbiage and figurative language, the bill in this case avers, substantially, the relation between the parents of the complainants of husband and wife, wanting only formal or ceremonial solemnization, a desire for its existence, and rejoicing that the new constitution would legalize their intercourse and legitimatize their children. Mr. Bishop, vol. 1, § 12, says: " The institution of marriage, commencing with the race, and attending man in all periods, in all countries of his existence, has ever been considered the particular glory of the social system. It has shone forth in dark countries and in dark periods of the world, a bright luminary on his horizon. And but for this institution, all that is valuable, all that is virtuous, all that is desirable in human existence, would long since have faded away in the general retrograde of the race, and in the perilous darkness in which its joys and its hopes would have been wrecked together." Marriage, then, says Mr. Bishop, is to be cherished by the government, as the first and choicest object of its regard. Pursuing this subject, he states this doctrine: " Therefore, every court, in considering questions not clearly settled or defined in the law, should lean toward this institution of marriage; holding, consequently, all persons to be married, who, living in the way of husband and wife, may

accordingly be presumed to have intended entering into the relation, unless the rule of law which is set up to prevent this conclusion is distinct and absolute, or some impediment of nature intervenes." This proposition is indeed sustained in part by the well recognized maxim, *semper præsumitur pro matrimonio* (the presumption is always in favor of marriage), a maxim too often practically overlooked by our tribunals; but, further than this, in all cases the presumptions both of law and of fact should be carried to the very verge to uphold a marriage, where marriage was meant by the parties. 1 Bish. M. and D., § 13. This doctrine is further enforced by the declaration, founded in truth, if not very truth itself, that marriage is "a civil institution, the most interesting and important in its nature of any in society." Marriage *per verba de præsenti* is illustrated by text-writers thus: Where the man says to the woman "I do take thee to be my wife," and she replies, "I do take thee to be my husband." Swinb. Spousals, 2d ed., 8; 1 Bish. M. and D., 227. And the same author says, that "any sign of assent is sufficient." 1 Bish. M. and D., 288. In the case at bar, the bill, in effect, avers a marriage *per verba de præsenti*, legal and effectual for all purposes, as the record now stands. The doctrine seems to be, that, though ignoring the directions of the statute, and though disregarding all forms and ceremonies, the law should make persons married who intend marriage. And this the constitution of our State has adopted as the organic law. All others, outside the class named, are in illicit, meretricious, or criminal cohabitation. Const., art. 12, § 22.

The State, says Bishop, will cause its citizens to assume the matrimonial status only where they consent to assume it. 1 Bish. M. and D., 12. " We have seen in the foregoing discussions that through all the law of marriage, runs the principle which puts it in the power of parties to assume or not, at their own election, the marriage status, while the status is imposed upon no one who does not accept it voluntarily." Ib., 121. Indeed, no marriage is valid without consent,

however consummated.  Ib., 93, 94, 218, 267.  Consent is the essence of marriage, without which it cannot exist.  Ib., 94.  In the absence of consent, the status of marriage is never superinduced by any government.  Ib., 218.  The law compels no one to assume the matrimonial status, because marriage requires for its constitution the mutual consent of the parties, which consent is the contract.  Ib., 218, and cases there cited.  The marital relation, or *status*, is created by contract; 1 Bish. M. and D., 3, 5, 7, 8, 19, 279, 280, 282; and this contract may be written or verbal, in words or by acts from which it may be implied.  Consent is essential, but no formal contract, assent or ceremony is necessary to its crea-tion.  Without consent, no statute or organic law can create this relation; and, when once created by the agreement, assent or acts of the parties, the relation cannot be dissolved save by due course of law.  Ib., 272.  A further most important deduction and warning is stated by Mr. Bishop, viz.: That parties occupying the *status* of husband and wife, legal and binding, until dissolved by due course of law, by enter-ing into other matrimonial relations, subject themselves to prosecution for bigamy.  Ib. 272 and cases there cited.

The arguments of counsel embrace a broad field, and discuss numerous points, as might be expected in a new and novel case.  The briefs and authorities cited have been examined with care, and the conclusions reached will be presently stated.

The constitutional provision under which this arises is as follows:  " All persons who have not been married, but are now living together, cohabiting as husband and wife, shall be taken and held, for all purposes in law, as married, and their children, whether born before or after the ratification of this constitution, shall be legitimate, and the legislature may, by law, punish adultery and concubinage."  Const. of Miss., art. 12, § 22.

This provision, in terms, recognizes a distinction between those living together, though unmarried, yet " as husband and wife," without formal solemnization, still, under an

agreement, or assent, in terms or by implication, of marriage; or that the parties were, in good faith, observing towards each other the relations of husband and wife, either under an agreement of such a union, or with a desire to assume to each other, honestly, that relation, on the one hand; and on the other, those living in adultery and concubinage, which the legislature may, by law, cause to be prosecuted and punished. And this distinction, it is believed, has been shown to be the doctrine of the text writers. In regard to the evil to be remedied by this constitutional provision, it is not necessary to go outside the record in pursuit of the objects of its operation. And this leads to the observation that the law recognizes no distinction on account of color. Neither can the amount of property involved enter at all into consideration. The moral status of the people is of paramount importance in all intelligent governments. Hence, the object of the constitutional provision under review may be assumed to have been in the interest of all classes—to arrest and correct wide-spread demoralization; to compel a line of demarkation between those in good faith having created or desired to create the marital relation, though thus cohabiting without the usual nuptial ceremony, and those cohabiting without any such purpose; to distinguish these classes by declaring one to be known and recognized as husband and wife, and their children legitimate, and by separating the other for prosecution as criminals against society and the State. The grand and most desirable object of this constitutional provision, undoubtedly, was to put a stop to meretricious cohabitation, and to induce all, or as many as possible, of this class, as well as those "cohabiting as man and wife," without formal marriage, to enter formally and publicly into the marital status; a consummation of incalculable importance to the welfare of the State.

With the adoption of the present constitution, former impediments to marriage between whites and blacks ceased, so that that question does not enter into the controversy. As a question of policy or propriety, people may differ, but

this is a view of the case which the court cannot entertain. They can only declare legal rules. Matters of taste and propriety, like this, the people must determine for themselves, within the established laws.

The labored and able arguments of counsels, that the provision of the constitution referred to, should be held to apply to the colored population alone, have not been overlooked. They state to us, in support of this construction, as a fact, that, as slaves, informal marriages were universal, resulting in numerous offspring. On the other hand, we were told that cases like the one at bar, were not altogether unfrequent. It is sufficient, that there is one case of this kind, within the plain letter and spirit of the constitution. The provision is plainly for all cases, black, white or mixed, within its plain letter. In effect, this court is asked to declare one rule, or to hold, that we have one constitution for the whites, and another for the blacks, a distinction precluded by recent events.

But, it is questionable, if the statements of counsel are judicially before us; further than that, we have a large colored population, lately slaves, now free, and in all respects equal before the law. It is believed, and so held, that the constitution, in its letter and spirit, applies, and was intended to apply, to all classes, " without regard to race, color or previous condition of servitude."

The right of parties in this State to contract marriage, without formal or ceremonial solemnization is understood to be settled beyond question; 12 S. & M., 9; 27 Miss., 783; 31 ib., 211; ib., 367; ib., 547; 39 ib., 745; 40 ib., 56; ib., 349; though it is otherwise in some of the States. Dennison v. Dennison, Md. Court of Appeals, 1871. Our statute does not in terms forbid it; and hence, such a marriage is lawful. Cases, *supra*, and 1 Bish. M. and D., 225, 283, 284.

It is, however, unnecessary to pursue this discussion further It is clearly the theory of the text writers, that the constitutional provision and review, can conclude marriage between those only, who, by agreement, express or implied, had

created and were occupying the relation of husband and wife, and such cases it not only sanctioned and consummated, but legitimated the offspring of previous intercourse. If, according to the doctrines of the authorities, such constitutional action was unnecessary, nevertheless, it was expedient and wise. It legitimated offspring and settled a rule, which could scarcely be confided to legislation with the certainty of satisfactory solution. It cannot fail to diminish what is understood to be a great evil by inviting attention thereto, and by its persuasive influence. It armed the legislature with power to fight the evil by necessary enactments, and it will be found to be an aid and guide to the judiciary in the disposition of cases arising out of these cohabitations, whether as husband and wife, or otherwise.

In the view entertained of the questions involved, and in the present attitutude of this case, it is not material to review at any length, the adjudications on marriage, *per verba de præsenti.* These cases are numerous, and many of them are both interesting and novel. Their present consideration might be essential, but for the constitutional provision of our State. Upon the evidence, their examination will very likely become necessary, as it will then be more pertinent. As already suggested, the constitution has relieved the legislature and the courts to a great extent, by its primary rule, so that this discussion has in view, mainly, the scope and intent of the organic law, and the indication of rules for its practical enforcement.

The conclusion is, that if these parties were " cohabiting as husband and wife," at the time of the adoption of the present constitution, and if, with a knowledge of its provisions, they mutually assented to the relation, then their marriage was consummated and their children legitimated. The question involved thus becomes one of fact to be determined accordingly.

The decree is reversed ; demurrer overruled ; and cause remanded, with leave to answer in forty days from this date.