Teter *v.* Teter.

No. 11,619.

TETER *v.* TETER.

MARRIAGE.—*Presumption.—Rights of Children.*—The presumption in favor of marriage and the legitimacy of children is one of the strongest known to the law, and in favor of a child asserting its legitimacy this presumption applies with peculiar force.

SAME.—*Solemnization.—Violation of Statute Requiring License.*—No ceremony or solemnization is necessary to validate a marriage, and a marriage is not rendered void by a failure to comply with a statute requiring the parties to obtain a license, though such failure may subject them to a criminal prosecution.

SAME.—*Consent.—What Constitutes.*—Where there is an agreement to form a present matrimonial connection, followed by cohabitation as husband and wife, no particular form of words is essential, provided it appears that the engagement was entered into from pure motives, and that the connection was not entered into from bad motives or for the mere purpose of sexual commerce.

SAME.—*Evidence.—Legitimacy of Children.*—Where a child asserts its legitimacy, and another child, in order to obtain property, asserts its own illegitimacy, it will require strong evidence to overcome the presumption of marriage, and where the evidence shows that the engagement of the parents was entered into from good motives and in the belief that there was no impediment to the marriage, and is followed by continued and open cohabitation as husband and wife after all impediments are removed, and by the execution of deeds as husband and wife, the presumption will not be overborne by the general statement that the parties were not married, but such statement will be construed to mean simply that there was no formal marriage ceremony.

From the Hamilton Circuit Court.

*R. Graham, J. S. Frazer, W. D. Frazer, T. J. Kane* and *T. P. Davis,* for appellant.

*R. R. Stephenson, L. O. Clifford, G. Shirts* and *W. R. Fertig,* for appellee.

ELLIOTT, J.—William H. Clayton and Mrs. Hannah A. Teter, a widow, entered into a contract of marriage, and on the 18th day of May, 1871, a license was obtained from the clerk and the marriage duly solemnized. Clayton had been

previously married, but he believed, in good faith, that the former marriage had been dissolved, and there were reasonable grounds for this belief, for he had been so informed by those who were in a situation to possess full information, and the announcement that a divorce was granted was in fact made, and was noted on the record of the court of common pleas of Muskingum county, Ohio, in a suit brought by his former wife. The decree, however, was never formally entered, and the suit was dismissed because of a failure to pay the costs. Mrs. Teter believed that there was no impediment to the marriage between her and Clayton, and the evidence leads to the inference that she died in that belief. The parties lived and cohabited together as husband and wife; they were so regarded by the community; they so held themselves out; a mortgage was executed by them as husband and wife; a child, the appellee, was born to them in October, 1874, received his father's name, and was always recognized as the child of lawful wedlock. In September, 1871, Clayton's former wife, Dora, did obtain a decree of divorce in the Greene Circuit Court of this State, and he testified that neither he nor the appellee's mother had reason to believe that there was any legal impediment to their marriage; that they continued to live together as husband and wife until her death, in 1877; but he also testified that they were married but once, and that this was on the 18th of May, 1871. Mrs. Teter, at the time of her marriage to Clayton, held the land in controversy in virtue of her first marriage with George H. Teter, who died in 1863, leaving as his heirs his wife, Hannah A. Teter, and his son, John H. Teter, the appellant.

The appellee's contention is that the marriage of his mother to his father, William H. Clayton, was absolutely void; that the land which descended to her from her first husband remained in her, and that he inherits it as her illegitimate child. The appellant's contention is that there was a marriage, and that his mother was Clayton's wife at the time of her death, and that the land is his, under the rule that the children of

the first husband inherit to the exclusion of the children of a second marriage, in cases where the mother dies during the second marriage the owner of land vested in her by descent from her first husband. This rule was approved when the case was in this court for the first time. *Teter* v. *Clayton,* 71 Ind. 237. At that time the appellee asserted his legitimacy, and claimed title, as a legitimate child, through a decree rendered in a partition suit, but he was defeated upon the ground that a decree in partition does not create title.

The appellee's success in this case depends upon the establishment of his own illegitimacy and his parent's shame. It will also require that we give to our statute an operation that will place the child of adulterous intercourse in a better position than one born in lawful wedlock, for, if the mother's illegitimate child be declared her heir, he takes a better position than a legitimate child, and succeeds to property vested in her in virtue of her first marriage, and partially excludes the child of the man through whom she derived her title, and he thus secures a more favored position than a child of a second lawful marriage can possibly attain. The effect of such a doctrine would be to favor children born bastards, to the exclusion of the issue of a lawful marriage. Public policy and justice seem to require that a child of adulterous intercourse should not be more highly favored than the child of lawful wedlock. The policy of our legislation is to keep the property vested in the wife by virtue of her first marriage beyond the reach of a second husband, and, surely, this policy ought to extend to the influence of a paramour, who has gained her affections. If the law with sedulous care guards the wife against the influence of a second husband, it should guard her with no less vigilance against that of a man whose relationship is as close as that of a husband, but is unsanctioned by morality or law. These considerations are important here, even though we do not undertake to follow them to their ultimate results, for they impress us, as they must every one, with the wisdom and justice of the rule, that the presump-

Teter *v.* Teter.

tion in favor of matrimony is one of the strongest known to the law. This presumption we stated and enforced when the case was last here, and we are not now inclined to relax its force or remit its rigor in the slightest degree. *Teter* v. *Teter*, 88 Ind. 494. Where the child of the first marriage asserts the validity of his mother's second marriage, and a child born to her of an asserted marriage with another man affirms its invalidity, and that he is himself the offspring of an adulterous connection, the presumption should be extended to its utmost verge.

In the last decision made by this court in this controversy, it was held that there was no valid decree of divorce rendered by the court of common pleas of Muskingum county, in the suit instituted by Clayton's former wife, for the reason that the suit was dismissed before a final judgment had been entered, and we were bound to presume that the judgment of dismissal was right. It was also held that the decision in *Light* v. *Lane*, 41 Ind. 539, required us to decide that if the man had a living wife, his subsequent marriage was void. We held further, that the presumption in favor of the validity of marriage in cases where the parties acted in good faith and cohabited as husband and wife, believing that there was a valid marriage, was one of very great strength, and that it was not overcome by the evidence adduced on the former hearing. We did not decide what evidence would be sufficient to overcome that presumption; we did no more than decide that the evidence then before us did not do it. In affirming that evidence is not sufficient to carry down a presumption, it is neither expressly nor impliedly affirmed that a certain quantity or quality of evidence will do it. In affirming that a certain quantity of powder is not sufficient to propel a ball to a given point, there is no determination of the question of how much will be required to carry the ball to that point. In deciding that there is not sufficient evidence to establish guilt, a court does not necessarily decide what evidence will produce that result. The question now presented was not settled by the former decision.

Teter *v.* Teter.

It is important to ascertain the status of the person who asserts the validity of the marriage. In this case the person who does this is free from all taint of wrong; he is asserting his mother's innocence of evil, and maintaining his right to property acquired by his father. If any right is lost to him it results from no wrong of his, but solely from the misconduct of another. He is, therefore, in a position to insist upon a full and broad application of the rule, that "the law presumes morality, and not immorality; marriage, and not concubinage; legitimacy, and not bastardy." *Hynes* v. *McDermott*, 91 N. Y. 451; S. C., 43 Am. R. 677. The son of the former marriage occupies a much more favorable position than one who had been guilty of either positive wrong or culpable negligence. It would be a wide departure from the true principles of justice to allow him to be shorn of his rights because his mother had been guilty of a moral wrong, and such a result should be avoided unless the clear words of a statute, or long settled rules of law, compel the courts to go to that length. It would be difficult to find any principle of natural justice that would justify a court in compelling a surrender of rights by one without fault at the demand of one who pleads his mother's wrong and his own illegitimacy as the ground of his claim to the property which is the subject of the controversy. We are firmly impressed with the belief that it is our duty to carry the rule, of which we have spoken, to its full extent, and hold that the continuous living together as husband and wife of Mr. and Mrs. Clayton, their acts as such, their well founded belief in the validity of their formal marriage, the husband's recognition of that relation after the divorce obtained by his first wife left him free to enter into a matrimonial engagement, the second wife's firm faith from first to last that she was lawfully married, the declarations of the parties that they were married, the acknowledgment of the appellee as the child of the marriage bed, create a presumption of marriage too strong to be overcome by the general statement of the husband, when on the witness stand,

that there was only one marriage. Our conclusion is dictated by sound principles of public policy, and just principles of morality. We violate no rule of law in holding this. There was a time when no impediment to Clayton's second marriage existed, and the strong and almost conclusive presumption from the facts developed by the evidence is, that there was present in the minds of the parties the mutual consent which gives validity to marriages even though there is no formal solemnization. It is not the formal ceremony that creates the marital relation. If the matrimonial engagement is entered into from pure motives, and the connection is not formed for the purpose of illicit sexual commerce, there may be a valid marriage although there is no formal celebration. The intention to assume the relation of husband and wife, attended by pure and just motives, and accompanied by an open acknowledgment of that relation, is sufficient to constitute a marriage. An adulterous connection, entered into without any intention to marry, can not operate as a valid marriage, but a connection, formed from pure motives and entered into with the intention of creating the relation of husband and wife, may establish such a marriage as the law will respect. Persons may be punished for not obtaining licenses to marry, or for not taking steps to secure a proper record of the marriage, but there may, nevertheless, be a valid marriage. The want of form, or the lack of ceremonial rites, does not impair a marriage contract, in cases where it is entered into from good motives and with an intention to contract a present marriage, and is followed by an open acknowledgment of the marital relation.

We said when this case was last here, that little, if any, formality was required in the marriage ceremony, and we now say that no formal ceremony is necessary, and that if the motives are good, the intention to effect an immediate marriage is present, and the purpose to unite as husband and wife exists in the minds of both parties, mutual consent is all that is required. A text-writer, in speaking of marriage, says: "We

maintain that the latter is the correct legal view; and that it should be said that the law requires in such cases a simple expression of mutual consent, and no more." Schouler Domestic Relations, section 25. At another place this author quotes from an English judge the following: "A marriage is not every carnal commerce; nor would it be so even in the law of nature. A mere carnal commerce, without the intention of cohabitation and bringing up of children, would not constitute marriage under any supposition. But when two persons agree to have that commerce for the procreation and bringing up of children, and for such lasting cohabitation,—that, in a state of nature, would be a marriage; and, in the absence of all civil and religious institutions, might safely be presumed to be, as it is properly called, a marriage in the sight of God." Ibid, section 26. Chancellor Kent says: " No peculiar ceremonies arc requisite by the common law to the valid celebration of the marriage. The consent of the parties is all that is required." 2 Kent Com. 87.

In Hutchins v. Kimmell, 31 Mich. 126 (S. C., 18 Am. R. 164), Cooley, J., speaking for the court, said : " Whatever the form of the ceremony, or even if all ceremony was dispensed with, if the parties agreed presently to take each other for husband and wife, and from that time lived together professedly in that relation, proof of these facts would be sufficient to constitute proof of a marriage." This is the view taken by the great majority of the American courts. Meister v. Moore, 96 U. S. 76 ; Dickerson v. Brown, 49 Miss. 357 ; Port v. Port, 70 Ill. 484 ; Lewis v. Ames, 44 Texas, 319 ; Dyer v. Brannock, 66 Mo. 391 ; S. C., 27 Am. R. 359 ; Campbell v. Gullatt, 43 Ala. 57 ; Askew v. Dupree, 30 Ga. 173.

This general doctrine extends so far as to sustain the validity of marriages made without complying with forms prescribed by statute, for it is held that such marriages will be sustained unless the statute expressly declares them void. Meister v. Moore, supra; Dyer v. Brannock, supra. If this be the rule where the common law doctrine prevails, there.

can be no doubt that it is the rule under a liberal statute like ours, which declares marriage to be a civil contract. The conclusion from these authorities is that the question whether there was or was not a marriage depends entirely upon the motives, intention and agreement of the parties, and not upon any mere matters of form or ceremony.

Consent is essential to the existence of a valid marriage, but it need not be evidenced in any particular form; if marriage was intended, and the circumstances show that the parties assumed to enter into that relation, consent will be inferred. Bishop says: "Not even words are in all circumstances necessary. Or it is sufficient that the parties, in language mutually understood, or by anything declaratory of intention, accept of each other as husband and wife. Even, as Swinburne observes, if the words do not of their natural meaning or by common use 'conclude matrimony,' yet, if the parties intend marriage, and their intent sufficiently appears, 'they are inseparable man and wife, not only before God, but also before man.'" 1 Bishop Marriage and Divorce, section 229. There can be no doubt that the parties in this instance never contemplated anything else than marriage, and the mutual consent was manifested in the formal marriage of 1871, and was clearly expressed in the declarations and conduct from that day until the relation was dissolved by Mrs. Clayton's death. The circumstances lead with almost irresistible force to the conclusion that the mutual consent to marry was given after, as well as before, the divorce was obtained by Clayton's first wife. If no form of words is essential to express the consent when the marriage is first contracted, we can see no reason why any should be needed to continue the relation after the removal of an impediment existing at the time of the formal celebration of the marriage. It would be more consistent with logical principles to hold that the subsequent cohabitation as husband and wife is referable to the consent expressed at the commencement of the connection between the parties, than to hold that it was an adulterous commerce, unsanctioned by

marriage. The reasoning, and, indeed, the decisions, of some of the courts, go very far in this direction. *Donnelly* v. *Donnelly*, 8 B. Mon. 113; *DeThoren* v. *Attorney General*, L. R. 1 App. Cas. 686; *Physick's Estate*, 4 Am. L. Reg. (N. S.) 418; *Fenton* v. *Reed*, 4 Johns. 51; *Rose* v. *Clark*, 8 Paige, 574; *Jackson* v. *Claw*, 18 Johns. 345; *In re Taylor*, 9 Paige, 611; Schouler Dom. Rel., section 26.

But we are not required in this case to go so far as to hold that the party denying the validity of the marriage must prove that it was repudiated before or after the removal of the obstacle to its validity ; all we need do is to decide that the general statement of Clayton is not in itself sufficient to overcome the presumption that the connection between the parties was the lawful one of husband and wife, and not the immoral one of adulterous commerce.

The general statement of Clayton that there was no marriage does not outweigh the facts elsewhere revealed in his own testimony. It is perfectly clear that he did not mean that there was no marriage arising out of an agreement, but that he meant that there was no formal second marriage. It is but justice to him to assign this meaning to his testimony. It is not unusual to use the word " married " as signifying the ceremony, and this we think was the sense in which it was employed by Clayton. The utmost that can be inferred from his testimony is, that there was no second formal celebration of the marriage. As no formal solemnization was needed, the fact that none took place does not overthrow the presumption of marriage. According to Clayton's own testimony nothing was wanting to a valid second marriage except its formal celebration.

Upon the facts the law is with the appellant. Judgment reversed.

Filed March 21, 1885.