### ADGER et al. v. ACKERMAN et al.

(Circuit Court of Appeals, Eighth Circuit. April 14, 1902.)

No. 1,632.

1. MARRIAGE—CIVIL CONTRACT—NO CEREMONY REQUIRED.

Marriage is a civil contract. An agreement of one woman and one man, competent to contract, to then become and thereafter be husband and wife during their joint lives, is a valid marriage contract, and no ceremony, civil or religious, is necessary.

2. SAME—MAY BE EXPRESS OR IMPLIED.

An implied contract of marriage is as binding and effective as one expressed by written or spoken words.

3. SAME—IMPLIED CONTRACT—PROOF OF.

A marriage may be implied or inferred from cohabitation, general reputation among acquaintances of the parties, their treatment of each other, and their speaking of and addressing each other as husband and wife, the christening of their offspring as their children, the bestowing of the name of the father upon a child of the union, and other acts, sayings, and conduct which have a natural tendency to show the existence of the marriage relation.

4. SAME—LEGAL PRESUMPTION IN CASES OF LEGITIMACY.

There is a strong legal presumption that a child is the fruit of a lawful, rather than of a meretricious, union, and that there was a timely marriage between the father and the mother before the birth.

5. SAME—COMMON-LAW MARRIAGE—SUBSEQUENT CEREMONIAL MARRIAGE.

A subsequent ceremonial marriage is not inconsistent with a prior common-law marriage, and does not necessarily overcome the presumption thereof arising from matrimonial cohabitation, repute, the declarations and acts of the parties.

6. SAME—ILLICIT RELATION — PRESUMPTION OF CONTINUANCE EASILY OVERCOME.

A relation, illicit in its inception, is presumed to continue, in the absence of countervailing evidence. But slight circumstances may be sufficient to establish a change from concubinage to matrimony, and evidence of the time or place of the change is not indispensable to its proof.

7. SAME—PRESUMPTION OF MARRIAGE ARISES WHEN OBSTACLE REMOVED.

Where parties incompetent to marry enter an illicit relation with a manifest desire to live in a matrimonial union rather than in a state of concubinage, and the obstacle to their marriage is subsequently removed, their continued cohabitation raises a presumption of a marriage immediately after the obstacle is removed, and will warrant a finding to that effect.

8. LEGITIMACY OF CHILDREN BORN IN WEDLOCK—STRONG PRESUMPTION OF.

Nothing may impugn the legitimacy of the issue of a lawful marriage less than proof of facts which show it to have been impossible that the husband could have been the father.

9. COMMON-LAW MARRIAGE—FACTS.

While A. was the husband of one woman he established an illicit relation, in 1889, with B., another woman, and from that time they cohabited and treated each other as husband and wife. They declared themselves to be such, and their general reputation among their joint acquaintances

was that of married persons. In November, 1890, A.'s wife procured a divorce and $25,000 alimony from him without any objection on his part. On September 2, 1892, B. bore him a son. On October 4, 1892, a ceremony of marriage between them was conducted. A. always recognized and treated the boy as his child. From the inception of their relation they manifested a desire and intention for a matrimonial, rather than a meretricious, union. *Held*, there was a common-law marriage between A. and B. immediately after the divorce.

(Syllabus by the Court.)

Appeal from the Circuit Court of the United States for the Eastern District of Missouri.

Alfred W. Fleming died intestate in the state of Missouri on January 10, 1898, leaving a widow, Mary Cecilia Fleming, née Quan, and her son Alfred W. Fleming, Jr., who had been born on September 2, 1892. While the deceased was not a practicing physician, he was commonly known as Dr. Fleming, and in this statement, and in the opinion which follows it, he will be designated in this way to distinguish him from his son, who bears the same name. On November 12, 1899, the widow Fleming died, leaving a will by which she bequeathed $1 to her son, and the remainder of her share of her deceased husband's estate to her father, Matthew Quan, who was subsequently appointed executor of her estate and curator of the estate of her son. In February, 1900, Quan filed a motion in the probate court for a distribution to him as such executor and curator of $50.000 of the estate of Dr. Fleming. Thereupon a brother, a sister, the heirs of a deceased sister, and some of the heirs of a deceased brother of Dr. Fleming exhibited their bill in the United States circuit court against Thomas F. Ackerman, the public administrator, Matthew Quan, and Alfred W. Fleming, in which they alleged that Dr. Fleming died without leaving any child or other descendant, and that they were his heirs, and in which they prayed that the public administrator might be enjoined from distributing the personal estate of the deceased to Matthew Quan as executor and curator, and that he might be directed to pay over to them their just shares thereof. The defendants Quan and Fleming answered that the latter was the only child of Dr. Fleming and Mary C. Fleming, his wife; that he was born on September 2, 1892; that between December 1, 1890, and October 1, 1891, Dr. Fleming and Mary C. Fleming contracted a common-law marriage; that from that time until his death they cohabited and lived together as husband and wife, and were reputed so to be; and that after the birth of Alfred W. Fleming a formal marriage ceremony was conducted between them. The usual replications were filed, testimony was taken, there was a final hearing on the merits, and the court dismissed the bill. From that decree the complainants have appealed.

John F. Lee and Robert F. Walker, for appellants.

Daniel Dillon, Joseph S. Laurie, and Thomas J. Rowe, for appellees.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

SANBORN, Circuit Judge, after stating the case as above, delivered the opinion of the court.

This case presents a single issue: Is the defendant Alfred W. Fleming the legitimate son of Dr. Alfred W. Fleming, deceased? There are, however, two other questions, the answers to which may go far toward the determination of this issue. They are: Was there a common-law marriage between Dr. Fleming and Mary C. Quan prior to November, 1891? And, if not, did the ceremony of marriage between them subsequent to the birth of the son raise a conclusive presumption of the legitimacy of the boy, under section 2917 of the Revised Statutes of Missouri?

Marriage is a civil contract. It is the agreement of one man and one woman, competent to contract, to then become and thereafter to be husband and wife as long as they both shall live. It differs from ordinary civil contracts in the fact that it may not be revoked or dissolved by the mutual consent or act of the parties. Like other agreements, however, it may be made without ceremonies, civil or religious, and it may be either express or implied. It may consist of a formal written instrument signed by the parties or of an express parol agreement between them. But neither documents nor spoken words are indispensable to its existence. An implied contract of marriage is as binding and effective as one expressed in words or spread upon parchment, and such a contract comes into being whenever the minds of the parties meet in a common understanding of and consent to the present and future existence of the relation of husband and wife between them.

In cases like that in hand, which involve the legitimacy of children, the legal presumptions are strong and the competent indicia are many from which such a marriage may be inferred. In criminal prosecutions for bigamy, incest, and adultery, and in civil actions for criminal conversation, strict proof of marriage is required. It is not so in suits involving the legitimacy of offspring. In such actions the legal presumption is that every child is the fruit of a lawful, rather than of a meretricious, union, and that there had been a timely and legal marriage between the father and mother before the birth of the child. Orthwein v. Thomas, 127 Ill. 554, 562, 563, 21 N. E. 430, 4 L. R. A. 436, 11 Am. St. Rep. 159. Every intendment is indulged in favor of legitimacy, and it is one of the strongest presumptions of the law,— a presumption not to be overcome by a mere preponderance of testimony or of probabilities,—that a timely marriage preceded cohabitation apparently matrimonial. Piers v. Piers, 2 H. L. Cas. 331; Hynes v. McDermott, 91 N. Y. 451, 458, 43 Am. Rep. 677; Teter v. Teter, 101 Ind. 129, 133, 51 Am. Rep. 742.

This dominant presumption may be strengthened by resort to the acts and conduct of the parties; by proof of cohabitation and general reputation among their acquaintances and friends (Boatman v. Curry, 25 Mo. 433, 438; Inhabitants of Newburyport v. Inhabitants of Boothboy, 9 Mass. 414, 415; Badger v. Badger, 88 N. Y. 547, 552, 42 Am. Rep. 263); of their treatment of each other; of their speaking concerning and addressing each other in the presence of third parties as husband and wife (Maryland v. Baldwin, 112 U. S. 490, 498, 5 Sup. Ct. 278, 28 L. Ed. 822); of the christening of the offspring of their union as their children (Hervey v. Hervey, 2 Wm. Bl. 877; State v. Worthingham, 23 Minn. 528, 536); of the conferring of the name of the father upon the son (Caujolle v. Ferrie, 23 N. Y. 90, 102); of the son's recognition and treatment by both parties as their child (Patterson v. Gaines, 6 How. 550, 589, 12 L. Ed. 553; Starr v. Peck, 1 Hill, 270, 272); and by proof of any and all acts, words, and conduct which have a natural and rational tendency to show the existence of the marriage relation.

These rules and principles of law are indisputable, and must serve as our guide in the consideration and determination of the questions

presented for discussion. In the light of them, let us now turn to the evidence, and ascertain, if possible, whether or not there was a timely common-law marriage between Dr. Fleming and Mary Quan prior to the birth of her son. Dr. Alfred W. Fleming was born on August 19, 1828. He was married to Ann Foster, a widow, about the year 1871, and was divorced from her on November 21, 1890. He was a man of considerable wealth, and the owner of a comfortable and well-furnished house and spacious grounds, where he resided, near Kirkwood, a suburb of the city of St. Louis. He was alert in his bearing, active in his habits, and fond of children, books, flowers, and pictures. He was neat in his person and dress when sober, but addicted to drink, and to offensive habits and practices when intoxicated. From 1879 to 1893 he rented rooms, which he often occupied, at 206 Chestnut street, in a manufacturing district in the city of St. Louis. His relations with his first wife became unpleasant. She sometimes became intoxicated, and in October, 1889, he left her and his residence near Kirkwood, and from that time until the spring of 1893 he spent much of his time with Mary Quan, who became his second wife, at his rooms on Chestnut street. In the spring of 1893 he moved her and her son to his residence near Kirkwood, where they resided until he died. Prior to that time, and on November 21, 1890, his first wife procured from him a divorce and $25,000 alimony. Mary C. Quan, the second wife, went to the rooms on Chestnut street to live with Dr. Fleming permanently in September or October, 1889, and from that time until his death he lived with and supported her. The defendant Alfred W. Fleming was born in these rooms on September 2, 1892. Dr. Fleming was present at the birth, and paid the attending physician. The certificate of the latter gives Alfred W. Fleming as the name of the child, A. W. as the name of the father, and Mamie as the name of the mother. On September 11, 1892, Dr. Fleming took the boy to the cathedral church, had him baptized, and bestowed upon him his own name. The entries in the baptismal registry are to the effect that the boy Alfred William Fleming was born September 2, 1892, of Alfred William Fleming, of 204 Chestnut street, and Mary C. Quan. On the Sunday following this christening the doctor gave a dinner at his rooms on Chestnut street in honor of the child, at which he presided, and where he received congratulations on the birth of his son. From the day of the birth of this child until the doctor died he manifested the greatest affection—the affection of a father—for this boy, and invariably treated him as his son. About a month after his birth, and on October 4, 1892, Dr. Fleming and the mother made an application for a license to be married, in which they stated under oath that they were single and unmarried. A license was issued by the clerk, and a marriage ceremony was conducted between them by a judge of one of the courts of the state of Illinois. After the ceremony they returned to the rooms on Chestnut street, where they continued to live and cohabit together until they moved to Kirkwood, in 1893.

The first wife of the doctor was a widow when he married her. She had borne a child to her former husband, but there was no issue of her marriage with the doctor. Shortly after the death of the doc-

tor Mrs. Fleming caused a large quantity of papers to be burned, and when in 1898 she applied to the probate court to be appointed guardian of her child she stated and insisted that he was born on September 2, 1893, when the fact was that he was born on September 2, 1892. The facts which have now been recited are either conceded or established beyond doubt. In addition to these established facts, there was a large amount of evidence consisting of declarations of the doctor and of his two wives, and of testimony concerning his habits, condition, and practices at various times, which tended to prove that he was incapable of begetting children. There was testimony tending to show that Mary C. Quan was not a chaste woman, and that she indulged in illicit relations with other men than the doctor as late as November or December, 1891. But there was no evidence of any unlawful relation between the doctor and any other woman after he commenced to live with Mary Quan on Chestnut street. One witness testified that Mary Quan told her that she was married to the doctor, but afterwards said that he had another wife, and that this was what was making her unhappy. Another said that Mary told him in June, 1892, that she expected to marry the doctor; and a third testified that between November 12 and December 13, 1891, she overheard a conversation in which Mary said to the doctor, "You agreed that if I became the mother of a child to marry me." He answered, "I will, too." And she replied, "I am satisfied then." But more than a dozen witnesses who associated with and knew these people when they lived on Chestnut street, neighbors, visitors, police officers, indeed all the witnesses who spoke on this subject, save the three whose testimony has been recited, come to say that they knew Dr. Fleming and Mary Quan as husband and wife from 1889 until 1893, that this was their general reputation among their acquaintances on Chestnut street, that they were known as Mr. and Mrs. Fleming, and that they spoke of, introduced, and treated each other as such. This testimony is so clear, so specific, so comprehensive, so voluminous, and persuasive that the facts must be deemed established that from the fall of 1889 until they moved into the doctor's residence near Kirkwood, in 1893, this man and woman lived together and treated each other as husband and wife, and that this was their general reputation among all who became acquainted with them while they lived on Chestnut street.

There are two witnesses who testify that shortly after the birth of the boy the doctor admitted to them that this child was not his son, and there are two more who say that he was practically silent when his paternity was questioned. But, on the other hand, the unvarying testimony of all the other witnesses upon this subject, witnesses so numerous and so credible that their evidence cannot be disbelieved, was that from the birth of the boy until the death of the doctor the latter invariably recognized, claimed, and treated him as his son. There was other testimony at the hearing which has not been recited, but with the exception of a single line of evidence, to which reference will shortly be made, there was no other evidence presented of sufficient importance to vary the conclusion to which that which has already been mentioned must lead.

It is contended that the sworn statement of the doctor and Mary Quan in their application for their marriage license in October, 1892, that they were then single and unmarried, and the conversation in November, 1891, in which he promised to marry her if she became a mother, are very persuasive, if not conclusive, evidence that they had not entered into the marriage relation before the ceremony was performed in 1892. But when all is said, these are but two statements that they were not married, and they are overcome by the many contrary statements which they made to numerous witnesses before and after November, 1891, by their conduct and general repute at Chestnut street, where they lived, and by the probability that when they made the two statements to which attention is so strenuously directed they were thinking not of an actual, but of a ceremonial, marriage only.

It is said that the fact that they conducted a ceremonial marriage after the birth of the child is strong, if not demonstrative, evidence that there was no marriage before. But it may well be that, although there was an actual marriage before, the facts that its proof was not of record, and rested only in matrimonial cohabitation, repute, declarations, and treatment, and that the doctor's estate was large, and his desire that the boy should inherit it earnest, induced them to make and record the ceremonial marriage as indubitable record evidence of their marriage relation and the legal rights of the boy, notwithstanding the fact that they knew there had been an actual marriage which made him their heir. A subsequent ceremonial marriage is not inconsistent with a prior common-law marriage, and it does not necessarily overcome the presumption thereof which arises from matrimonial cohabitation, the declarations and conduct of the parties, and their reputation. Betsinger v. Chapman, 88 N. Y. 488, 496, 499; Starr v. Peck, 1 Hill, 270, 272.

The relation between Dr. Fleming and Mary C. Quan was illicit in its inception. It commenced before the doctor was divorced from his first wife, and it is insisted that the presumption that it continued to be unlawful until the ceremonial marriage was solemnized must prevail, in the absence of evidence of the time and place of a change to the matrimonial relation. A relation of concubinage is presumed to continue in the absence of evidence of a change to matrimony, and there are a few decisions which support the contention of counsel here. Barnum v. Barnum, 42 Md. 251, 296, 297; Cunninghams v. Cunninghams, 2 Dow (House of Lords) 482; Clayton v. Wardell, 4 Comst. 230, 236. But the true rule and the great weight of authority is that inasmuch as the law itself and all its presumptions deprecate illegal, and favor lawful, relations, slight circumstances may be sufficient to establish a change from an illicit to a legal relation, and that proof of its time or place is not indispensable. Badger v. Badger, 88 N. Y. 547, 553, 42 Am. Rep. 263; Caujolle v. Ferrie, 23 N. Y. 90, 106, 110; In re Taylor, 9 Paige, 611, 614; Fenton v. Reed, 4 Johns. 52, 4 Am. Dec. 244; 1 Bish. Mar. & Div. § 965. In this way it appears from a review of this evidence that there is nothing in it which imperatively forbids a finding that there was a valid marriage between these parties subsequent to the divorce and prior to the

month of November in the year 1891, and yet if the case rested here this question might be grave and its answer difficult.

Fortunately there is an established principle of law, and a class of evidence in this record to which it applies, which removes this doubt and difficulty. The principle of law is that where parties who are incompetent to marry enter an illicit relation with a manifest desire and intention to live in a matrimonial union rather than in a state of concubinage, and the obstacle to their marriage is subsequently removed, their continued cohabitation raises a presumption of an actual marriage immediately after the removal of the obstacle, and warrants a finding to that effect. The Breadalbane Case (Campbell v. Campbell) L. R. 1 H. L. Sc. 182, 206, 212; De Thoren v. Attorney General, 1 App. Cas. 686; Fenton v. Reed, 4 Johns. 52, 4 Am. Dec. 244; Hynes v. McDermott, 91 N. Y. 451, 458, 43 Am. Rep. 677; In re Taylor, 9 Paige, 611; Rose v. Clark, 8 Paige, 574; Van Buskirk v. Claw, 18 Johns. 346; Caujolle v. Ferrie, 23 N. Y. 90; Betsinger v. Chapman, 88 N. Y. 487, 499; Starr v. Peck, 1 Hill, 270; Gall v. Gall, 114 N. Y. 109, 118, 21 N. E. 106; Donnelly v. Donnelly, 8 B. Mon. 113; Blanchard v. Lambert, 43 Iowa, 228, 22 Am. Rep. 245; State v. Worthingham, 23 Minn. 528; Dickerson v. Brown, 49 Miss. 357; Floyd v. Calvert, 53 Miss. 37, 45; Jones v. Jones, 45 Md. 155; Yates v. Houston, 3 Tex. 433–450.

In the case at bar the obstacle to the marriage in the inception of the illicit relation was the prior marriage of Dr. Fleming to his first wife, which was still undissolved. That obstacle was removed by the divorce in November, 1890. The facts in the leading case upon this subject, which received great consideration in the house of lords, the Breadalbane Case (Campbell v. Campbell), were in all essential particulars identical with those in the case at bar. James Campbell had eloped with the wife of one Ludlow in the year 1781, and had lived and cohabited with her until his death in 1806. Ludlow had died in 1784. The question was whether Campbell was married to the widow of Ludlow between 1784, when he died, and 1788, when their first child was born. There was a consensus of opinion among the judges that such a marriage should be inferred immediately after the death of Ludlow. Lord Westbury said:

"There is nothing to warrant the proposition that the subsequent conduct of the parties shall be rendered ineffectual to prove marriage by reason of the existence, at a previous period, of some bar to the interchange of consent. It would be very unfortunate if it were so. * * * There is no foundation for the argument that the matrimonial consent must of necessity be referred to the commencement of the cohabitation, nor any warrant for the appellant's ingenious argument that, as the consent interchanged must be referred to some particular period, which he insisted was at the commencement of the cohabitation, and therefore insufficient, the cohabitation, which continued afterwards without interruption, would warrant no other conclusion than that which would be warranted by the consent interchanged at a time when it was insufficient. I should undoubtedly oppose to that another, and, I think, a sounder, rule and principle of law, namely, that you must infer the consent to have been given at the first moment when you find the parties able to enter into the contract. The conclusion, therefore, that I derive, and which, unquestionably, is consistent with the language of the cases which have been referred to, is that the consent between these parties was given, and that the marriage, therefore, in theory of law, took place, at

the time when, by the death of the first husband, they became competent to enter into the contract." L. R. 1 H. L. Sc. p. 212.

Lord Cranworth said:

"I cannot but infer, from all which occurred with respect to the mode in which these persons lived together, not only that they desired to be husband and wife, but also that they believed themselves to be so. In such circumstances we ought to infer, after their deaths, that at some time during the long period during which they lived together, and in some manner, however informal, they did that which they could do without any difficulty, viz., enter into an agreement to be or become married persons, and so to acquire for themselves and their children the status which the evidence satisfies me they wished to enjoy." L. R. 1 H. L. Sc. p. 206.

The other authorities which have been cited above demonstrate the fact that the English and American courts have adopted the views and have followed the principle thus announced in the Breadalbane Case, and have permitted these views and this salutary principle of law to control the determination of like cases whenever they have been presented for decision.

Do the facts of this case subject it to the application of this principle? One of the witnesses testified that while Mary Quan was living with Dr. Fleming on Chestnut street she first told her she was married to him, but subsequently said that he had another wife, and that this was what was making her unhappy. This testimony and her continued cohabitation and life with him show clearly enough that she desired the matrimonial relation. Moreover, there is a class of evidence in this record that is free from all suspicion of preparation for the trial of this issue, from all taint of prejudice, interest, or influence, and that is undimmed by the lapse of memory. It portrays the purpose, intentions, and desires of these parties in establishing and maintaining their relation in a way that cannot fail to carry conviction to the mind of every unprejudiced reader. It consists of more than 40 letters written to Mary Quan by Dr. Fleming between April 1, 1887, and June 18, 1897. In the first letter, which is postmarked April 2, 1888, he wrote to her: "You are well aware how I am situated, plenty financially and possessing all the world's goods that ought to make me happy; yet there is lacking the one great thing, love connubially. No respect,—no confidence; nature forces me to look elsewhere. I am of a very loving and amorous disposition. What am I to do?" He wrote her on December 19, 1888: "I am feeling a great deal better, and if I could only be with you would be perfectly well again. I hope the day is not very far off when you and I will be together for good." On December 24, 1888, he wrote: "Perhaps this time next year we will be together for good." On December 26, 1888, he wrote: "This time next year I hope and trust, sweet one, that you and I will be together for good, never to be separated, not even by death." And on January 23, 1889, he wrote: "I am not happy without you, and never will be contented until you and I are united forever, never to be separated either in this world or the next." Here are but a few extracts from the many letters contained in this record. These letters cover a long period of time. They show no change of affection, desire, or purpose, but exhibit from the commencement of the correspondence, in 1887, until its close, in 1897,

the year before the death of the doctor, the same fervid and enduring affection for the woman he made his wife, the same purpose to so unite himself to her that they could not be separated,—a purpose to accomplish which he deserted his first wife, consented to a decree of divorce at her suit, and paid her the sum of $25,000 alimony. These letters and the testimony of the witnesses leave no doubt that it was the purpose and intention of Dr. Fleming and Mary Quan when they commenced living together permanently in the rooms on Chestnut street, in 1889, to become husband and wife as soon as the obstacle of his marriage to his first wife should be removed. The ceremonial marriage is but another proof of this purpose. The doctor's desertion of his first wife, his repeated expression of his desire to be indissolubly united with Mary Quan, his consent to the divorce, his payment of the alimony, his recognition of her as his wife and her child as his son, are consistent with no other theory, and the case falls far within the rule that where this desire and purpose exist continued cohabitation after the removal of the obstacle raises the presumption and warrants the finding of a marriage at the first moment when it could lawfully be made. This principle of law and the clear preference and purpose which these people exhibited to make their union matrimonial, rather than meretricious, forbid the finding that they were not married before November, 1891.

In the absence of countervailing evidence, the testimony of the declarations regarding the impotency and sterility of the doctor, regarding the two or three declarations that he made that the boy was not his son, regarding the few statements of Mary Quan that she was not his wife, regarding her acts of burning papers and of stating the date of the birth of her son a year too late, regarding her lack of chastity and the unnatural practices in which she and the doctor are alleged to have indulged, their oaths that they were single when they applied for their license to marry, and evidence of less importance which points in the same direction, might well overcome the presumption of legitimacy, and lead to the conclusion that these parties were not married until the ceremony of October 4, 1892. But all this evidence is overwhelmed by the persuasive proof that, while the relation between the doctor and Mary Quan was illicit in its inception, it was entered upon and continued with the actual and expressed desire and purpose to make it matrimonial instead of meretricious as soon as the obstacle of the doctor's first marriage should be removed; that upon the removal of this obstacle the cohabitation continued so that the presumptions of the marriage and of the legitimacy of its issue immediately arose when the decree of divorce was rendered in November, 1890; that the doctor and Mary Quan were reputed to be husband and wife among all their acquaintances and friends who knew them at 206 Chestnut street; that they lived and cohabited together as Mr. and Mrs. Fleming; that they declared themselves to be so; that they addressed and introduced each other as husband and wife during all the time from 1889 until the death of the doctor; that from the time when Dr. Fleming deserted his wife, in the fall of 1889, and established his permanent relation with Mary Quan in the rooms on Chestnut street, until his death, in 1898, he supported her, and exhibited an

unchanging affection and care for her; that he was present at the birth of her son; that he took him to the cathedral church for his christening, and caused the entries in the baptismal registry to record himself as his father; that he bestowed upon him his own name, and from the day of his birth until he died recognized him as his son and heir, and manifested for him all the care and affection of a father. The preponderance of the evidence goes hand in hand with the presumptions of the law, and they must prevail. They lead unerringly to the only conclusion consistent with the desire, purpose, conduct, declarations, and reputation of these people from the fall of 1889 until the death of the doctor, the conclusion that there was a common-law marriage between Dr. Fleming and Mary Quan immediately after the divorce of the doctor from his first wife in November, 1890, and that is the finding of this court.

The effect of the conclusion which has now been reached, the conclusion that there was an actual marriage between Dr. Fleming and the mother of the defendant Alfred W. Fleming in November, 1890, is that he was born in lawful wedlock, and that he is presumptively the legitimate son and heir of the doctor. It is still contended by counsel for the complainants, however, that the evidence conclusively shows that Dr. Fleming could not have been the father of this boy, and that his paternity must be attributed to some one of the younger men who visited the apartments of his mother. They insist that the age of the doctor, in 1891, 63 years; his previous habit of intoxication; the fact that he had no children by his first wife, although she had borne one to her first husband; his own declarations and those of his wives to the effect that he was impotent or sterile; the testimony that he suffered from gonorrhea; the fact that he lived with Mary Quan three years before she bore her son; the testimony of the unnatural practices in which they indulged, and of the illicit relations between Mary Quan and other men,—conclusively prove that Dr. Fleming was incapable of begetting a child, and that he could not have been the father of her son. They are met, however, by the indisputable principle of the law that where once a marriage is proved nothing can impugn the legitimacy of the issue short of proof of facts which show it to have been impossible that the husband could have been the father. Patterson v. Gaines, 6 How. 550, 558, 12 L. Ed. 553. Now, the substance of the evidence for the complainants upon this issue, with the exception of the testimony relative to the declarations of the doctor and his wives upon this subject, was submitted to six medical experts, three produced by the complainants and three by the defendants, and the former answered that it was not, and the latter that it was, possible for Dr. Fleming to have been the father of the son of his wife. The testimony of the experts does not persuade us that the strong presumption of legitimacy was overcome thereby.

The court below excluded from the evidence all the testimony of the declarations of Dr. Fleming and of his two wives relative to his impotency and his sterility, and the testimony of one witness relative to a declaration of the doctor that he had suffered from gonorrhea, and these rulings are assigned as error. Objection to the consideration of these specifications of error is made because no exceptions

were taken to the rulings. The conclusion reached by the court has rendered it unnecessary to consider or decide the questions that are thus presented. Conceding, but not deciding, that all this testimony was competent and relevant, it has been patiently read and considered with the other evidence in the case, and yet, in view of the entire record, the court is unanimously of the opinion that the fact that it was impossible for Dr. ·Fleming to have been the father of this child is not established, nor is it proved beyond a reasonable doubt that he was not his father. Much of the evidence has already been recited, and its effect has been discussed. It is too voluminous for detailed review. One or two of its salient points will be mentioned, and this question will be dismissed. The letters of Dr. Fleming have suffered no change from the interest of parties or the fierceness of this controversy. They were written without thought of this issue. They disclose the character, the disposition, the purpose, and the passion of the writer, and it is extremely difficult to read them and believe that they are the letters of an impotent or a sterile man. The relation with Mary Quan, which he so earnestly sought, and which he established and maintained at so much sacrifice, is equally inconsistent with that belief. He was supporting, caring for, cohabiting with the mother of the defendant, Alfred W. Fleming, and treating her as his wife, for three years before this boy was born. If he was incapable of begetting a child, he knew it, and he knew that this boy was not his son. It is incredible that in such a situation he would attend the mother while she gave birth to the son of another, record himself as the father of this child in the registry of his baptism, bestow upon him his own name, recognize him as his son and his mother as his wife, for six years and until he died. The only theory of this case that squares with the writings, the acts, and the conduct of this man, and with the ordinary course of human action under similar circumstances, is that he believed himself to be, and that he was, the father of this boy. These considerations and a careful review of the entire record have forced our minds to the conclusion that the decision of the court below that the defendant Alfred W. Fleming was the legitimate son of the doctor was right, and that it ought not to be disturbed.

There is another reason for this result. There is a statute in the state of Missouri which reads: "If a man, having by a woman a child or children, shall afterward intermarry with her, and shall recognize such child or children to be his, they shall thereby be legitimated." Rev. St. Mo. § 2917. It is contended by counsel for the appellees, on the one hand, that under this statute recognition of the children by the husband is conclusive evidence that he was their father. On the other hand, counsel for the appellants insist that it is only those children which the husband has had by a woman before the marriage that his recognition legitimates, that it does not legitimate children which the woman has had by other men before the marriage, and that the issue whether or not the woman had the child or children in question by the man who subsequently becomes her husband or by another man is always open to proof de hors the recognition of the husband. The majority of the court is of the opinion that the contention of counsel for the appellees is sound and

should prevail, and that if there had been no common-law marriage the ceremonial marriage of October 4, 1892, and the subsequent recognition by Dr. Fleming of the child of his wife as his son, would have legitimated him; but the writer of this opinion does not concur in this view.

The sum of the whole matter is that the defendant Alfred W. Fleming is the legitimate son and heir of Dr. Alfred W. Fleming, deceased, and that the decree of the court below must be affirmed. It is so ordered.

THAYER, Circuit Judge (concurring). The evidence in this case, which I have studied attentively, has not served to convince me of the existence of a common-law marriage between Dr. Fleming and Mary C. Quan, notwithstanding the presumption that is so earnestly invoked in support of the existence of such a marriage contract. I am of opinion that their relations were illicit, and were understood by them to be illicit, until their formal marriage, on October 4, 1892, which was one month after the child Alfred W. Fleming was born. I accordingly dissent from the conclusion reached by my associates as to the existence of a common-law marriage.

I concur, however, in the order affirming the decree below for the following reasons:

The Missouri statute (Rev. St. Mo. 1899, § 2917), quoted in the foregoing opinion, declares that "if a man, having by a woman a child, * * * shall afterward intermarry with her and shall recognize such child * * * to be his," it shall thereby be legitimated. This statute, in my opinion, in effect makes the fact that a man recognizes a child, born out of wedlock, as his offspring, after he has married the mother, persuasive, if not conclusive, evidence that he is the father of such child. The question is pertinent, why did the legislature require recognition unless it was to be taken as evidence of paternity from one who was most liable to know the fact? It cannot be reasonably claimed that the legislature intended that recognition should have no probative force, as respects the question of paternity, and that this latter fact must be established otherwise than by recognition. No legislature would be apt to sanction such a doctrine, and, if it had been the intention of the legislature to formulate that rule, nothing would have been said concerning recognition, but the statute would have simply declared that if a man has by a woman a child, and subsequently marries her, the child shall be deemed legitimate. Besides, the rule which denies that recognition has any probative force or only slight weight, as bearing on the question of paternity, would leave an illegitimate child in practically the same helpless and unfortunate condition which such children occupied before the statute was enacted, since it would frequently be impossible for a child to prove its paternity otherwise than by recognition. The statute in question was inspired by an humane purpose. It was intended primarily for the benefit of those who were so unfortunate as to be born out of wedlock, and who, for that reason, were made outcasts by the common law, and looked upon as having no inheritable blood. As the statute is remedial, and was enacted mainly for the

benefit of illegitimate children, it should be construed liberally so as to afford them the utmost protection. Looking at the statute from any point of view, I am impressed with the idea that the words of the statute, "and shall recognize such child to be his," would have had no place therein unless it had been intended that recognition should be regarded as the very highest evidence of paternity. I am of opinion, therefore, that the legislature intended to give to acts of recognition the effect of evidence of a very decisive character, upon the theory that a man who marries a woman who has an illegitimate child is most interested in knowing and is most liable to know whether the offspring is his, and would not be prone to recognize it as his offspring unless it was his. Statutes of other states have been framed upon the same theory; that is to say, making recognition evidence of paternity. For example, in Michigan, the written acknowledgment by a man that an illegitimate child is his, he having married the mother, in and of itself renders the child legitimate. Comp. Laws Mich. 1897, § 9067. Statutes of a very similar character have been adopted in Iowa, Minnesota, Montana, Alabama, and possibly some other states. Code Iowa 1897, § 3150; Gen. St. Minn. 1891, § 3887; Rev. St. Mont. 1895, § 302; Code Ala. 1896, § 374.

In the present case it is not necessary to adopt the extreme view that recognition of an illegitimate child by a man who has married its mother is conclusive proof of paternity which no evidence can overturn, and hence that the legitimacy of a child born out of wedlock, if it is recognized, by force of the statute is placed on a firmer foundation than the legitimacy of a child born in lawful wedlock, and no decisive opinion need be expressed on that point. I think that it is true, however, that by the recognition of a child born out of wedlock, under the circumstances aforesaid, such a child is placed in the same favorable position as one born during wedlock; that it can only be rendered a bastard, after such recognition, by the same kind of proof which is required to overturn the legitimacy of a child born in the course of wedlock; and that it is entitled to the benefit of the same presumptions.

I fully concur in the views expressed in the foregoing opinion to the effect that the evidence in the case at bar was insufficient to show that Dr. Fleming was not and could not have been the father of Alfred W. Fleming, and also insufficient to overcome the very strong presumption of legitimacy which the law raises for the protection of those who are born in the course of wedlock. It being my view of the case, as above expressed, that because Alfred W. Fleming was recognized by Dr. Fleming as his child, after the formal marriage on October 4, 1892, and continuously until the doctor's death, such recognition placed the child in the same favorable position as if born in the course of wedlock, it follows, as a matter of course, that the evidence in question was likewise insufficient to overcome the presumption of legitimacy which existed in his favor, although there had been no common-law marriage prior to Alfred W. Fleming's birth.

For these reasons, somewhat hastily expressed, I concur in the order affirming the decree of the lower court.