NORRELL v. NORRELL ET AL.

[No. 27,785. Filed October 13, 1942.]

*Joseph K. Brown, John Browder,* and *Will H. Porter,* all of Indianapolis, for appellant.

*Otis E. Gulley,* of Danville, and *William E. Reiley* and *Miller & Bredell,* all of Indianapolis, for appellees.

FANSLER, J.—This is an action by the appellant asserting that she was the wife of James R. Norrell and is entitled to participate in the distribution of his estate as his widow. There was an answer in general denial, a trial by the court without a jury, and judgment for the defendants.

Error properly assigned questions the correctness of the judgment in view of the evidence.

The plaintiff testified that in August, 1937, she and the decedent, Dr. James R. Norrell, agreed that they would be husband and wife, and that from that time, until his death in July, 1939, they lived together as husband and wife on the premises and in the room where she had been living prior to their agreement; that he introduced her to his friends and acquaintances as his wife, and held her out to be his wife; that for

the last seven or eight months of his life he was in poor health and that she looked after him and took care of him and made him comfortable; that she got in touch with his brother, Dr. John Norrell (the administrator), after the decedent became ill; that his brother was with them in their room, where they lived together as husband and wife, at the time of decedent's death; that his brother attended him until the night before he died, when he called in another doctor; that the plaintiff suggested that her husband be taken to a hospital, but that his brother said he was too far gone. She testified that she worked and helped to pay their living expenses and paid some of the premiums on his insurance; that at the funeral she rode in the car with the family, consisting of Dr. John Norrell and his wife, and that she was with them during the entire services.

Mattie Rice testified that she lived at the same address; that she was acquainted with the plaintiff and Dr. James R. Norrell. This witness appears to have operated the rooming house in which they lived. She said the plaintiff had roomed with her for five years, and that in the month of August, 1937, Dr. James R. Norrell came to her and said, "I want to get a room from you for my wife and myself," referring to the plaintiff as his wife; that she rented them the room; that: "Sometimes he paid me and sometimes she paid me. Sometimes I did not get my money at all"; that Dr. Norrell and the plaintiff lived in her room as husband and wife from that time until he died; that letters, papers, and magazines came to the plaintiff by mail, addressed to "Mrs. Norrell"; that on several occasions she went out with them to a restaurant; that she heard Dr. Norrell introduce the plaintiff to different persons as his wife, and that he would speak of her as his wife

in the presence of others; that he said he had a good wife and that she was good to him.

Fred Johnson testified that he was a magazine and newspaper solicitor; that he approached Dr. Norrell seeking to sell him magazines; that the doctor said he would have to come back and see his wife; that he returned later, and the doctor said, "My wife is up-stairs," and that he called to her and the plaintiff came down; that a subscription for magazines was taken in the name of Lucille Norrell, and that the plaintiff is the woman who was referred to by the doctor as Mrs. Norrell; that he was there several times soliciting and making collections; that he saw them together on those occasions and never heard Dr. Norrell call the plaintiff anything but Mrs. Norrell.

Loretta Israel testified that the plaintiff and the decedent lived at the same place continuously after August, 1937; that they lived there as husband and wife; that she visited them, and when the doctor was sick helped wait on him. She testified: "Well, he said to me one morning, 'Mrs. Israel, you call my wife—' he was sitting on the porch, very big step to the door, 'will you call my wife. I am awfully sick.' He said to me, 'This is going to be my future wife.' He said, 'She is so nice to me, I don't think I could better myself. She is just as kind to me and good to me as if she had been mine for a long while.' That was three or four weeks before he was taken down so awfully ill." She was asked: "Q. And at times, he referred to her as his wife? A. Yes, sir, at all times." She testified that she had heard him refer to her as Mrs. Norrell in the presence of other people, and had heard him introduce the plain-tiff to people as his wife. In cross-examination the following developed: "Q. What time did you say you heard him say that 'This is my wife.'? A. Come to

my door one morning. Q. When was it? A. He asked me would I call her. He was sitting on the porch very sick. Q. When was it? A. I don't know exactly. Q. Approximately when? A. Well, it was along—I don't know exactly the time. I would not testify to that. I don't remember. Q. How long before his death? A. Oh, it was about three or four weeks before. Q. Three or four weeks before his death? A. Yes, took very sick on the porch one morning. Q. And he said to you, 'This is going to be my future wife.'? A. No, he said that to me away along in the summer time. . . . I don't know the time. I could not testify to something I did not understand. Q. Would it be four or five months before his death? A. Yes, longer than that. Q. Six months? A. No, two or three months, I think, as near as I remember. . . . Q. They had been living in the same room as man and wife prior to the time that he told you that 'This is going to be my future wife.'? A. Yes."

Robert Moody testified that he sometimes drove Dr. James R. Norrell's car for him. He said that he heard the decedent refer to the plaintiff as his wife. He said that, prior to August, 1937, he heard Dr. Norrell present the plaintiff to a restaurant proprietor and say, "My future wife, Mrs. Norrell."

The defense offered no evidence.

A valid marriage relationship may be created without civil ceremony. In *Teter* v. *Teter* (1885), 101 Ind. 129, 134, 135, this court said: "The intention ▓ to assume the relation of husband and wife, attended by pure and just motives, and accompanied by an open acknowledgment of that relation, is sufficient to constitute a marriage." The court quoted Judge Cooley with approval, as follows: " 'Whatever the form of the ceremony, or even if all ceremony was

dispensed with, if the parties agreed presently to take each other for husband and wife, and from that time lived together professedly in that relation, proof of these facts would be sufficient to constitute proof of a marriage.' " It is said that there is some confusion and difference of opinion as to the necessity of cohabitation and reputation to complete a common-law marriage, but there is much reason to believe that this apparent conflict arises out of the various methods by which it is sought to prove and establish the marriage contract. 35 Am. Jur., Marriage, § 28 et seq., p. 198. In *Trimble* v. *Trimble* (1850), 2 Ind. 76, 78, Perkins, J., speaking for this court, quoted with approval from Bouvier's Law Dictionary as follows: " 'The common law requires no particular ceremony to the valid celebration of marriage. The consent of the parties is all that is necessary, and as marriage is said to be a contract *jure gentium*, that consent is all that is needful by natural or public law. If the contract be made *per verba de presenti*, or if made *per verba de futuro*, and followed by consummation, it amounts to a valid marriage, and which the parties can not dissolve if otherwise competent; it is not necessary that a clergyman should be present to give validity to the marriage; the consent of the parties may be declared before a magistrate, or simply before witnesses, or subsequently confessed or acknowledged, or the marriage may even be inferred from continual co-habitation and reputation as husband and wife, except in cases of civil actions for adultery or public prosecutions for bigamy. . . .' " We construe the language to mean that a contract by which the parties agree to immediately become husband and wife is sufficient, but that a contract to become husband and wife in the future is not a marriage contract, but a contract for marriage in the future which must be

followed by consummation of the relationship, and that the fact of marriage may be inferred from continual cohabitation and reputation. Thus reputation involves only a manner of proof. Otherwise there could be no common-law marriage *de presenti,* since the establishment of reputation requires time. It is also quite clear that, in the absence of direct proof of a marriage contract, proof that the parties lived together as husband and wife and held themselves out publicly and represented themselves to be husband and wife is sufficient to establish the relationship.

The appellant testified to an express marriage agreement over the objection of the appellees. The court heard the evidence after announcing that if it was determined that it is incompetent he would not consider it. In *Lowrance* v. *Lowrance et al.* (1932), 95 Ind. App. 345, 182 N. E. 273, it was held that the widow was not a competent witness to prove her marriage to a decedent because of the provisions of § 2-1716, Burns' 1933, § 305, Baldwin's 1934, which provides: "In all suits by or against heirs or devisees, founded on a contract with, or demand against, the ancestor, to obtain title to or possession of property, real or personal, of, or in right of, such ancestor, or to affect the same in any manner, neither party to such suit shall be a competent witness as to any matter which occurred prior to the death of the ancestor." This statute was enacted in 1881 (Sp. Sess.), Acts 1881, ch. 38, § 277, p. 240. There was no petition to transfer. The case of *Shaffer* v. *Richardson's Administrator* (1866), 27 Ind. 122, 129, involved the claim of the appellant to her distributive share of the estate as the widow of the decedent. There was an answer denying that she was the widow. It was contended that the claimant was disqualified under a statute substantially identical with the one quoted. The court

said: "The first objection urged to the evidence is, that it comes within the first proviso of section 3 of the act in relation to witnesses, &c. Acts 1865, p. 59. We do not so regard it. This is not a suit in which a judgment is sought against the estate represented by the administrator, within the meaning of that proviso. The object is not to recover a judgment against the administrator upon a debt or demand against the estate, or, in any wise, to diminish the amount of assets in his hands for distribution. The appellant claims to be a distributee of the estate, and the evidence given by her went simply to the question of her right as the decedent's widow to claim as such. Nor does it come within the second proviso of that section. This is not an action against heirs, nor is it founded on a contract with, or demand against, the ancestor, within the meaning of that proviso. No evidence was given by the appellant of any communication made to her by her husband, in contravention of the prohibition of said section. Her evidence was only as to matters within her own knowledge, of which she was authorized to testify." In *Sherwood, Administrator* v. *Thomasson* (1890), 124 Ind. 541, 24 N. E. 334, a widow was asserting her right to a distributive share of the funds. Her right to participate seems to have been disputed upon the ground that she had deserted her husband, and not upon the ground that she was not legally married to the decedent. It was held that she was a competent witness upon the authority of *Shaffer* v. *Richardson's Administrator*, *supra*, and *Hamlyn et ux.* v. *Nesbit, Adm'r* (1871), 37 Ind. 284, 292, 293, in which the court said:

"It is also claimed by the appellants, that the court erred in permitting the administrators to testify as witnesses on the trial of the cause. We do not think so. We do not think that this comes within either the

letter or spirit of the law. The proviso relied upon is as follows: 'Provided, that in all suits where an executor, administrator, or guardian is a party in a case where a judgment may be rendered either for or against the estate represented by such executor, administrator, or guardian, neither party shall be allowed to testify as a witness, unless required by the opposite party, or by the court trying the cause, except,' etc.

"The object of this proviso was to protect the estates of decedents from unjust demands on the part of the living. The mouth of the decedent being closed by death, the law closes the lips of the living.

"The principal question involved in the case under consideration affected the distribution of the surplus. There could not have been a judgment either for or against the estate. We entirely approve of the construction placed upon the above proviso by this court in *Shaffer* v. *Richardson's Adm'r*, 27 Ind. 122.

"This case does not come within the spirit of the above proviso, for the reason that nearly all of the disputed questions of fact occurred subsequent to the death of the decedent, and the testimony of the parties was not, therefore, subject to the objection that the living was swearing against the dead."

It must be concluded from these decisions that one claiming to be the widow is not entirely disqualified as a witness, but is disqualified from testifying to conversations or transactions which took place between the witness and the decedent during his lifetime. It will be concluded therefore that the trial court considered the testimony of the appellant so far as it was competent within this rule and excluded her remaining testimony from consideration.

There is undisputed evidence that in August, 1937, the decedent came to the operator of the rooming house

where the appellant lived, and engaged a room for himself and wife, referring to the appellant as his wife; that he and appellant lived in this room as husband and wife until his death; that letters, papers, and magazines came through the mail to the plaintiff, addressed to "Mrs. Norrell"; that the decedent introduced the plaintiff to various persons as his wife, and that he spoke of her as his wife in the presence of other people; that at all times he referred to the plaintiff as his wife. It is true that Mrs. Israel testified that the decedent said: "This is going to be my future wife." She seems to have been somewhat confused as to the time when this statement was made, but she also testified that they had lived together as husband and wife since August, 1937, and that he always referred to the appellant as his wife, and it is clear that she considered them to be husband and wife. If Mrs. Israel's testimony to the effect that the decedent referred to the appellant as his future wife within a few months prior to his death, is to be accepted as reliable and true, her testimony that they lived together as husband and wife continuously after August, 1937, and that he at all times referred to her as his wife, must also be accepted as true. Giving full and literal credence to this and the other testimony leads to the conclusion that a common-law marriage was consummated by the parties living together and holding themselves out to the community as husband and wife, and that thereafter the husband made statements inconsistent with their established status. Once a common-law marriage is established, it cannot be dissolved or renounced by the words, actions, will, or intention of either or both of the parties. If there had been conflict in the evidence that the parties had lived together and held themselves out to the public as husband and wife for more

than a year after August, 1937, when the decedent rented quarters for himself and his wife, the statement attributed to him at some uncertain time, apparently within a few months before his death, might have had important weight in resolving the conflict, but the evidence that they began living together as husband and wife in August, 1937, is positive and undisputed, and even Mrs. Israel testifies to the fact, and that during that time he referred to and introduced and held the appellant out as his wife. The administrator, who was decedent's brother and a physician, attended the decedent in his last illness, in the quarters occupied by the appellant and the decedent, and it is not disputed that at decedent's funeral the appellant rode in the car with the family and was with them during the entire services. The decedent and the appellant lived together at the same place for the last two years of his life. It is reasonable to assume that the decedent's brother and administrator made some investigation of the facts in preparing to defend against the appellant's claim. The record does not disclose whether the decedent had children or a father or mother surviving. His brother and administrator might have been an heir if the appellant's claim was disproven, and at least he would have a family interest in the heirs. There is undisputed evidence that the decedent introduced the appellant to various people as his wife, and that he always referred to her as his wife. If this is not true, it is reasonable to assume that an investigation in the neighborhood would have discovered some witness or witnesses who would testify to some fact inconsistent with appellant's claim, or that in the community in which they lived the parties were reputed to occupy some other status than that of husband and wife. The fact that no such evidence is produced by the defense is entitled to con-

sideration in appraising the evidence. It must be concluded that the one isolated statement attributed to the decedent, the time of the making of which is most uncertain, is not sufficient to create a substantial conflict in the otherwise clear, positive, and undisputed evidence.

Judgment reversed, with instructions to sustain appellant's motion for a new trial.

NOTE.—Reported in 44 N. E. (2d) 97.